535 S.E.2d 668

**Lorna Lee SCELBA, Appellant,**

v.

**Vincent A. SCELBA, Respondent.**

**No. 3223.**

Court of Appeals of South Carolina.

Submitted June 5, 2000.

Decided July 17, 2000.

Richard H. Rhodes, of Burts, Turner, Rhodes & Thompson, of Spartanburg, for appellant.

Richard N. Tapp and Ann E. Sumner, both of Greenville, for respondent.

GOOLSBY, Judge:

This is an appeal of a divorce decree. The wife, Lorna Lee Scelba, appeals: (1) the grant of a divorce to the husband, Vincent A. Scelba, on the ground of adultery; (2) the valuation and equitable division of the marital assets; and (3) the award of attorney fees. We dismiss the appeal.[1]

## FACTS AND PROCEDURAL HISTORY

The parties married in 1978 and have one son, who was emancipated and had matriculated at Furman University when the case came to trial. At the time of the final hearing, the husband was seventy-seven years old and the wife was fifty-two.

The parties lived in New Jersey for approximately four years after they married. Both then received three-year

---

1. Because oral argument would not aid the court in resolving the issues on appeal, we decide this case without oral argument pursuant to Rule 215, SCACR.

assignments as missionaries in Haiti; however, because of illness, they were unable to remain abroad to fulfill their commitments. After they returned from Haiti, they lived on their farm in New York. During that time, the wife worked as a church minister in a small country church. Although the husband began receiving retirement and social security benefits within a few years of the marriage, he also worked in a variety of occupations. These included buying, selling, and renovating real estate, performing professionally as a concert cellist, and serving as mayor of Milon, New York.

Sometime around 1990, the wife, without objection from the husband, accepted a position with a church in Greer, South Carolina. Because, however, the husband had two years remaining on his term as mayor, he remained in New York while the wife moved with the parties' son to South Carolina. In 1992, the wife was appointed pastor of Triune Methodist Church in Greenville, where she served as minister until sometime in 1998. After the husband moved to Greenville, he became Executive Director of the Carolina Youth Symphony.

In February 1997, the wife introduced the husband to Samuel Dewey Wykle. Wykle frequently joined the parties for supper in their home, staying through the evening. Although Wykle lived only a few blocks away from the church parsonage, the wife would drive him home. The husband testified the wife would leave with Wykle about 9:00 p.m. and return after 11:30 p.m. Eventually, the situation progressed to the point that the husband would wake up the next morning and discover the wife had stayed out the entire night. This became more and more frequent as the days went on. In the summer of 1997, the wife drove Wykle to West Virginia for medical treatment and spent the night in a motel with him. When the husband questioned the wife about this incident, the wife said Wykle had slept on the floor.

The parties' farm in New York was sold December 7, 1997. Because they never intended to live in a large place again, the parties decided to sell most of their furnishings there and keep only their favorite pieces. The day before the farm was sold, however, the wife, much to the husband's surprise, came to the residence with a large van and three men. They

emptied the house out, leaving only a few things of lesser value.

The day after the sale, the husband drove back to South Carolina. When he arrived at the parsonage, he found his clothes on the porch with a note that said, "Please leave. I don't want you here any more." The husband, however, stayed at the parsonage, where, a few days later, he was served with a motion for temporary relief and the initial complaint in these proceedings. The husband soon filed a return to the motion and an answer and counterclaim to the complaint. On January 5, 1998, the husband amended his responsive pleadings to include a request for a divorce on the ground of adultery, alleging the wife had engaged in an illicit relationship with Wykle.

A temporary hearing took place January 12, 1998. At the hearing, the parties proffered a final settlement of all the issues in the case. The family court, however, refused to approve the settlement because the wife expressed too much reservation when she testified about her consent to the agreement.

A second temporary hearing took place May 26, 1998. On May 29, 1998, the family court issued a temporary order requiring both parties to account to each other for all property in his or her possession, restraining both parties from alienating any property during the pendency of the action, restraining and enjoining both parties from removing any property from the family court's jurisdiction while the litigation was pending, and ordering the wife to surrender to the husband certain personal effects, namely, "Moroccan rugs, a statue from the Louvre, and a crucifix," no later than June 10, 1998. The family court also ordered the wife to pay $10,000.00 in attorney fees, suit costs, and investigative fees to the husband's attorney by June 5, 1998.

On July 14, 1998, the husband requested a rule to show cause against the wife, alleging she had violated the temporary order by denying him access for purposes of inventory and appraisal to property in her possession or under her control and failing to give him the Moroccan rugs, the statue from the Louvre, and the crucifix. On July 15, 1998, the family court ordered the wife to appear on September 4, 1998,

to show cause why she should not be held in contempt for violating the temporary order of May 29, 1998. Although the wife was represented by counsel at the September 4 hearing, she herself failed to appear.

The family court declined to consider the merits of the allegations concerning the wife's violations of the temporary order, holding these issues should be considered only when the wife "is physically brought before the Court to answer the charges." Nevertheless, the family court found the wife had been personally served with the order and rule to show cause and failed to appear without a valid excuse. The family court therefore held the wife in contempt for failing to appear at the scheduled hearing and issued a bench warrant for her arrest.

Subsequently, the husband moved for sanctions against the wife for failure to appear at a scheduled deposition. At a hearing on December 7, 1998, at which the husband, his attorney, and the wife's attorney were present, the family court found the wife failed to appear at her deposition and ordered her to pay attorney fees of $400.00 through the office of the husband's attorney.[2]

The final hearing took place March 17, 1999. Present at the hearing were the husband, the husband's attorney, the husband's witnesses, and the wife's attorney. Again, the wife failed to appear, this time because of the outstanding bench warrant for her arrest. The family court refused to grant a motion by the wife's attorney to continue the case. Counsel for the wife rested after requesting the family court to consider a financial declaration filed at the temporary hearing and submitting an affidavit of attorney fees. The family court then proceeded to take testimony from the husband and his witnesses.

The family court issued the final order in the case on March 23, 1999. Pertinent to this appeal are the following provisions in the order: (1) the grant of the divorce to the husband on the ground of adultery;[3] (2) the award to the wife of only thirty-five per cent of the marital property; (3) the valuations

---

2. In his brief, the husband states these fees have not been paid, and the wife has made no assertions to the contrary.

3. The evidence of adultery also included the following: (1) cancelled checks for a reservation for an aborted New Year's Eve rendezvous at a

of the parties' pension plans; and (4) the award of attorney fees to the husband in the amount of $18,615.00, which included the $10,000.00 ordered at the temporary hearing.[4] The matters raised by the husband in the rule to show cause have still not been resolved.

## DISCUSSION

■ Dismissal of a litigant's appeal has been recognized as "a proper sanction for his or her contemptuous conduct."[5] Furthermore, "[u]nder the court's inherent power to ignore the demands of litigants who persist in defying the legal orders and processes of the jurisdiction, the court may dismiss an appeal by a person who stands in contempt of court in the proceeding in which he seeks to take an appeal."[6] This discretionary right of an appellate court to refuse to hear an appeal, a right known as the "fugitive disentitlement doctrine," has long been recognized by the United States Supreme Court.[7] The policy behind the doctrine has since been explained as follows:

> The rationales for this doctrine include the difficulty of enforcement against one not willing to subject himself to the

---

mountain inn in North Carolina and notations in the wife's handwriting on an advertisement for the inn; (2) an investigator's, testimony that, on the evening of December 27, 1997, he saw the wife and Wykle first dining together at Hardees and then passionately kissing each other in the wife's Lexus automobile while the car was parked first, with the interior lights on, in a handicapped space at a Bi–Lo and less than an hour later at a Dairy Queen, at which time the couple assumed noticeably compromising positions; (3) a last will and testament executed by the wife naming Wykle as personal representative as well as a partial beneficiary; (4) five cancelled checks written from December 3, 1997, to January 1, 1998, to Wykle totaling $899.00, all of which were signed by the wife and payable on her account; and (5) a van rental contract signed by the wife and listing Wykle as an additional driver.

4. Although the husband's attorney received $10,000.00 from the wife, it was determined after the final hearing that the wife had made the payment with funds belonging to the husband.

5. 17 C.J.S. *Contempt* § 109, at 188 (1999).

6. 17 Am.Jur.2d *Contempt* § 226, at 578 (1990).

7. *United States v. Barnette*, 129 F.3d 1179 (11th Cir.1997) (citing *Ortega–Rodriguez v. United States*, 507 U.S. 234, 113 S.Ct. 1199, 122

court's authority, the inequity of allowing that "fugitive" to use the resources of the courts only if the outcome is an aid to him, the need to avoid prejudice to the nonfugitive party, and the discouragement of flights from justice.[8]

■ In order for an appellate court to invoke the fugitive disentitlement doctrine to dismiss an appeal, two prerequisites must be met: (1) the appellant must be a fugitive; and (2) there must be a connection between the fugitive status and the appellate process the appellant seeks to utilize.[9] We hold both requirements have been satisfied here.

■ Without question, the wife, by her own actions, has become a fugitive in this litigation. The family court found her in contempt for her failure to appear at the hearing on the rule to show cause on her failure to abide by the temporary order.[10] After a bench warrant was issued for her arrest, she was found to have willfully failed to appear at a scheduled deposition. At the final hearing, her attorney candidly informed the family court that she was not present because of her belief that she would be arrested on the bench warrant. To date, the matters giving rise to the bench warrant have not been adjudicated because of the wife's refusal to submit to the family court's jurisdiction.[11] The wife's predicament is analogous to those of escapees whose appeals were dismissed while they continued to evade criminal process.[12] Nevertheless, the

L.Ed.2d 581 (1993) and *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970)).

8. *Barnette*, 129 F.3d at 1183.

9. *Id.*

10. The wife's attorney was given several additional days after the hearing date to inform the family court of any unanticipated emergency that would have prevented the wife's absence; however, counsel did not present any justifiable excuse.

11. The bench warrant is still outstanding. Moreover, while the appeal has been pending, the wife, when responding to a motion by her attorney to withdraw from the case, corresponded with this court using an out-of-state post office box as her address.

12. *E.g., Lamb v. State*, 293 S.C. 174, 359 S.E.2d 282 (1987); *Martin v. State*, 276 S.C. 514, 280 S.E.2d 210 (1981); *State v. Johnson*, 44 S.C. 556, 21 S.E. 806 (1895).

fact that the adjudication of contempt against the wife arose from a civil matter does not affect her status as a fugitive.[13]

Furthermore, we hold case law supports our finding of a sufficient connection between the wife's fugitive status and her appeal to this court. In *Huskey v. Huskey,*[14] this court declined to adjudicate an appeal of the equitable division of parties' marital property because the appellant had absconded from the family court's jurisdiction in order to avoid arrest for failure to appear in connection with a contempt proceeding arising from the divorce but concerning matters outside the property division. Citing *Benedict v. Benedict,*[15] this court stated, "We decline to hear the appeal of a party who by absenting himself from the jurisdiction and evading the processes of the court frustrates the administration of justice."[16]

Here, the nexus between the wife's fugitive status and her appeal to this court is even stronger than that in *Huskey.* Among other things, the wife has appealed the award of attorney fees to the husband. In addressing that issue, the family court stated, "This was a lengthy case made complex by the Wife's refusal and failure to cooperate and follow the Orders of this Court. The Husband's attempts to secure the Wife's compliance with the Court's Temporary Order and be able to inventory and appraise all furnishings were frustrated by the Wife." Furthermore, the wife has already flouted prior orders requiring her to pay the husband's attorney fees.

After reviewing the record and briefs, we further hold the circumstances of this case warrant the application of the fugitive disentitlement doctrine and dismissal of the wife's appeal. To effectuate the property division, the family court

---

**13.** *See Empire Blue Cross and Blue Shield v. Finkelstein,* 111 F.3d 278, 281 (2d Cir.1997) (stating that "a fugitive from justice need not be a fugitive in a criminal matter to warrant application of the disentitlement doctrine").

**14.** 284 S.C. 504, 327 S.E.2d 359 (Ct.App.1985).

**15.** 280 S.C. 508, 313 S.E.2d 56 (Ct.App.1984). In *Benedict,* this court "decline[d] to hear an appeal of a person, who, by secreting his whereabouts, frustrates the administration of justice in our state and during the appeal process evades the processes of the court and refuses to submit himself to its jurisdiction." *Id.* at 510, 313 S.E.2d at 58.

**16.** *Huskey,* 284 S.C. at 505, 327 S.E.2d at 360.

granted the husband a judgment against the wife in the amount of $166,311.59 and ordered the wife to transfer certain assets to the husband through a qualified domestic relations order. The family court also granted the husband a judgment for attorney fees and retained jurisdiction to grant an additional judgment to the husband if the wife failed to execute the qualified domestic relations order. Nevertheless, as long as the wife refuses to submit to the jurisdiction of the family court and to otherwise disclose her whereabouts, the husband has no practical means of enforcing the final divorce decree, whether that enforcement involves compelling the transfer of certain assets or executing a judgment.[17]

Under these circumstances, we hold it would be inequitable to allow the wife to use the appeal process to obtain a judgment that is favorable to her.[18] Considering the wife's

---

**17.** *See Barnette,* 129 F.3d at 1183 ("Impossibility of enforcement was the initial reason for the establishment of the fugitive disentitlement doctrine.").

We note in passing that, despite the wife's position as a church minister, the testimony reveals she committed other improprieties that show an indifference on her part to the law and to the rights of others. These include taking the husband's handicapped parking pass, taking and failing to repay $6,800.00 from the husband without his permission, and confiscating the husband's C-pack (a medical device that allowed him to breathe properly with only one functioning lung) for about a week.

**18.** *See United States v. Sharpe,* 470 U.S. 675, 681 n. 2, 105 S.Ct. 1568, 84 L.Ed.2d 605 (stating the disentitlement doctrine is based on equitable principles); *Molinaro,* 396 U.S. at 366, 90 S.Ct. 498 ("While such [fugitive status] does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims."); *Barnette,* 129 F.3d at 1184 (stating, in dismissing an appeal because of the appellant's fugitive status, that " '[h]e who offends against the law seeks in vain the help of the law' is a very old legal maxim"). In *Barnette,* the eleventh circuit court of appeals further supported its decision by stating that: (1) no good reason existed to anticipate that a decision adverse to the appellant would affect the satisfaction of his forfeiture judgment; and (2) the appellant ("only wishes to use this court in an attempt to receive a favorable judgment—the only judgment by which, it appears, he will abide."). *Id.*

In dismissing the wife's appeal, we note that other jurisdictions have reached similar results in family court litigation. *See, e.g., Schmidt v. Schmidt,* 610 A.2d 1374 (Del.1992) (holding the husband had forfeited his right to appeal the family court's decision concerning property

flagrant disregard of prior orders in this litigation, we take a dim view of the possibility that she will voluntarily return to South Carolina or otherwise cooperate with any order that she does not fancy.

**APPEAL DISMISSED.**

CURETON and SHULER, JJ., concur.

division because he was in defiance of a court order and had evaded further enforcement); *Medina v. Medina*, 115 N.C.App. 493, 445 S.E.2d 61, *review denied*, 337 N.C. 694, 448 S.E.2d 528 (1994) (dismissing the wife's appeal of an order finding her in willful contempt because her whereabouts remained unknown); *Guerin v. Guerin*, 993 P.2d 1256 (Nev.2000) (dismissing a fugitive wife's appeal of an order directing the transfer of property and of a subsequent order of contempt).

In *Medina*, the North Carolina Court of Appeals dismissed an appeal by the plaintiff, whose whereabouts remained unknown after she was found in contempt of a visitation order, and stated, "[I]f we affirm the orders of the trial court, the plaintiff is not likely to present herself to the court and comply with the orders.... If we reverse the orders of the trial court, plaintiff will appear or not, as she may consider most for her interest." *Id.* at 63 (citations omitted).