792 A.2d 1222

SATOKO MATSUMOTO, PLAINTIFF–RESPONDENT, v. TATSUYA
MATSUMOTO AND KAZUKO MATSUMOTO, DEFENDANTS–
APPELLANTS.

Argued September 24, 2001—Decided January 30, 2002.

111

112

*Laurence H. Olive,* argued the cause for appellant Tatsuya Matsumoto.

*Joan E. Pransky,* argued the cause for appellant Kazuko Matsumoto.

*Joseph J. Haskins, Jr.,* argued the cause for respondent.

The opinion of the Court was delivered by

LONG, J.

This case requires us to determine whether the fugitive disentitlement doctrine should be applied to bar an appeal in a civil case and if so, to limn its contours.

I

Defendant, Tatsuya Matsumoto, married plaintiff, Satoko Matsumoto, in Japan on March 18, 1984. Their only child, Hyugo, was born in New York City on July 6, 1985. The Matsumoto family resided in New Jersey from 1985 to 1997. During that time, they were essentially supported by Tatsuya's mother, Kazuko Matsumoto, who lived in Japan. They resided in a house Kazuko owned in Cedar Grove. Over time, the marital relationship began to deteriorate. In March 1997, the Matsumotos and their son traveled to Japan for the purpose of enabling Satoko to attend a Buddhist ceremony commemorating the anniversary of the death of her father. The Matsumotos differ over what happened during the trip but agree that their son remained in Japan and that they returned to the United States on separate flights.

Satoko contends that during the trip Tatsuya and his mother began to pressure her to stay in Japan, and that Tatsuya forcibly detained her for a period of time in an effort to coerce her to remain in Japan permanently. She also claims that she had to flee to her mother's house, and that thereafter Kazuko prevented her from communicating with Hyugo. Satoko returned to the

United States by herself. Tatsuya contends that Satoko's return to America without Hyugo was volitional.

Tatsuya left Hyugo with his grandmother and briefly returned to the United States where he liquidated all bank accounts, totaling over $1,000,000, sold the cars, and had all the Matsumotos' furniture shipped to Japan. The contents of the house had a value of $413,000. Tatsuya also informed Hyugo's school that his son would not be returning. Satoko claims that during that time Kazuko had the locks changed on the marital residence, instructed her real estate manager not to give the keys to Satoko and directed the agent to remove Satoko's personal belongings from the house.

On April 25, 1997, Satoko filed a complaint for custody and separate maintenance and an *ex parte* application for an order to show cause. She was awarded sole temporary custody of Hyugo and exclusive possession of the house in Cedar Grove. Tatsuya and Kazuko were ordered to return Hyugo within forty-eight hours. In addition, the court ordered Tatsuya to account for all personalty he had removed from New Jersey and enjoined him from dissipating assets acquired by the parties during the marriage.

Neither Tatsuya nor Kazuko complied with the order. As a result, on May 2, 1997, a supplemental order to show cause issued, which included the threat of arrest warrants against Tatsuya and Kazuko for contempt. Tatsuya and Kazuko did not respond, and on July 3, 1997, the trial court entered a final order imposing sanctions against them of $1,000 per day retroactive to the date Hyugo was removed to Japan and continuing to accrue until Hyugo was returned. That order also adjudicated Tatsuya in violation of Satoko's rights for his failure to comply with the April 25, 1997 Order directing him to account for the personalty he had removed from New Jersey.

In June 1997, Satoko filed an Amended Complaint alleging additional causes of action, including intentional infliction of emotional distress, international interference with custody, fraud and

conversion. The complaint contained a prayer for equitable distribution. In September 1997, Satoko filed a Second Amended Complaint adding claims for divorce and alimony. Neither Tatsuya nor Kazuko responded. Accordingly, a default was entered. A subsequent motion by Kazuko's attorney to reopen the default was denied.

On December 4, 1997, criminal indictments issued against Tatsuya and Kazuko for conspiracy to interfere with child custody, interference with child custody, and child endangerment. On December 23, 1997, bench warrants issued for Tatsuya's and Kazuko's arrest for failure to appear at the arraignment.

In March 1998, Tatsuya and Kazuko submitted certifications to the trial court offering to waive personal jurisdiction defenses in exchange for a dismissal of the arrest warrants, monetary sanctions and criminal indictments. Tatsuya further responded that he would bring Hyugo to New Jersey and would establish a temporary residence until the court decided the custody issue. In May 1998, the trial court denied Tatsuya's request. In June 1998, Kazuko's attorney contacted Satoko's attorney and asked him to cooperate in vacating the civil and criminal warrants so that Tatsuya and Kazuko could bring Hyugo back to New Jersey.

Having received no response, the attorney faxed a letter to Satoko's attorney informing him that Hyugo would be arriving at Newark airport at 6:55 p.m. on July 16, 1998. Satoko's attorney wrote back stating that Satoko would not be available from mid-July until after August 24, 1998. Hyugo returned to the United States on or about July 10, 1998.

During the period that Hyugo was in Japan, Tatsuya and Kazuko refused all letters and gifts sent to him by Satoko, and mother and son became estranged. Thus, when Hyugo initially came back to New Jersey, he stayed at a friend's house and Satoko visited him. Ultimately, Hyugo moved in with Satoko but their differences were irreconcilable. Satoko alleges that Hyugo was programmed by Tatsuya and Kazuko "to exhibit unprecedented violence and hostility towards [her]," and that during the time

that Hyugo stayed with her he was physically abusive—"kicking her repeatedly, knocking her to the ground, and striking her with a plastic bottle." Ultimately, because Hyugo's demands to return to Japan were relentless and Satoko could no longer control him, she felt that she had no choice but to allow him to leave. However, she sought an Order that would give her continued custody of Hyugo while he attended school in Japan (as he was demanding) and require him to live with her at times that the school was not in session.

The matter was set down for a hearing on September 21, 1998. In the interim, on September 11, Satoko allowed Hyugo to return to Japan. Satoko wrote to Hyugo and the letters were not returned. Instead, Hyugo wrote the following responses: ". . . you bitch"; "Go to hell and die"; "Don't send any more mail"; "Don't use me for the case"; and "I have severed all the ties with you."

In February 1999, Tatsuya and Kazuko filed a motion to "Define Rights of Defendants at Default and Sanction Hearing." In essence, they sought the right to fully participate in the divorce action. The application was denied except for the opportunity to cross-examine Satoko's witnesses. Counsel for Tatsuya made an oral request that Hyugo be examined by a psychologist and interviewed by the trial court. The trial court ruled that Tatsuya, as a party in default, lacked standing to make that application. Subsequently, in April 1999, Hyugo's paternal uncle, Dr. Yasunori Matsumoto, sought to represent Hyugo and to be appointed as *guardian ad litem* to participate in a best interests investigation. He proposed an *in camera* interview with the child. On April 6, 1999, the court appointed Dr. Matsumoto as *guardian ad litem* conditioned upon the posting of a $100,000 surety bond, and appointed Dr. Madelyn Milchman, Ph.D., to conduct a psychological evaluation. On April 23, 1999, the court interviewed Hyugo *in camera*.

On June 7, 1999, Dr. Milchman issued a report recommending that (1) both parents receive complete psychological and custody

evaluations before a final custody award issued; and (2) Hyugo's stated desire to live in Japan should, pending the award, be respected. She also concluded that Hyugo did not show evidence of having been "programmed" or "brainwashed."

A Judgment of Divorce entered in June 1999 granted Satoko temporary legal and residential custody of Hyugo. An Amended Judgment of Divorce was entered in July 1999. As a result, Satoko was awarded the marital residence, $944,500 in assets, permanent alimony in the amount of $48,000 per year, retroactive alimony in the amount of $54,000, and sole custody of Hyugo along with child support in the amount of $271 per week. Tatsuya was further ordered to pay for Hyugo's medical and dental insurance and to maintain two irrevocable life insurance policies to protect the alimony and child support awards, respectively. In addition, the court imposed on both Tatsuya and Kazuko (jointly and severally) compensatory damages of $179,500 for their intentional interference with custody as well as punitive damages ($100,000 against Tatsuya and $200,000 against Kazuko). Finally, Satoko was awarded attorneys' fees and costs totaling $58,152. Dr. Yasunori Matsumoto's application for the return of his escrowed funds was denied. Tatsuya and Kazuko appealed from the entirety of the judgments against them, and Dr. Yasunori Matsumoto appealed from the denial of the return of his funds.

The Appellate Division reversed the trial court's order denying Dr. Matsumoto's application that the escrowed funds be returned to him. *Matsumoto v. Matsumoto,* 335 *N.J.Super.* 174, 187–88, 762 *A.*2d 224 (App.Div.2000). With respect to Tatsuya and Kazuko, the Appellate Division held: (1) the exercise of personal jurisdiction over Kazuko did not violate the due process clause; and (2) the refusal of Tatsuya and Kazuko to comply with court orders prevented consideration of their appeals based on the "fugitive disentitlement doctrine":

[B]ecause the trial court had jurisdiction over both defendants, their refusal to respond to the warrants, return to the State and litigate here prevents our consideration of their respective appeals. *See, e.g., Molinaro v. New Jersey,* 396 *U.S.* 365, 366, 90 *S.Ct.* 498, 498–99, 24 *L. Ed.*2d 586, 587–88 (1970); *State v. Rogers,*

90 *N.J.* 187, 447 *A.*2d 537 (1982) (criminal appeals); *Kamelia S. v. Derek S.,* 82 *Cal.App.* 4th 1224, 1229, 98 *Cal.Rptr.*2d 816 (2000) (*appeal dismissed* where appellant violated court orders, was in contempt for absconding with child who had been placed in foster care and warrants were issued for his arrest).
[*Id.* at 185, 762 *A.*2d 224 (footnote omitted).]

The Appellate Division stated that "in these circumstances we believe that defendants should not be able to ask us for relief while refusing to otherwise respond to the lawful orders of our courts." *Ibid.* Accordingly, the court dismissed the appeals of Tatsuya and Kazuko without prejudice to reinstatement upon their surrender or upon vacation of the warrants outstanding against them. The Appellate Division also lifted the stay that it had imposed on the distribution to Satoko of the proceeds of the sale of the marital residence. On motions of Kazuko and Satoko, we reimposed the stay but permitted the distribution of $25,000 from the funds held in escrow.

We granted the petitions for certification filed by Tatsuya and Kazuko on a single issue: the application of the fugitive disentitlement doctrine to them. 167 *N.J.* 635, 772 *A.*2d 937 (2001). In essence, both Tatsuya and Kazuko claim the fugitive disentitlement doctrine should not be adopted for use in civil cases and, alternatively, that if adopted it should be narrowly applied. Kazuko argues separately that even if the fugitive disentitlement doctrine applies to civil cases, it is inapplicable to her because she did nothing to warrant its invocation. We have carefully reviewed the record in light of those contentions. We now affirm but modify the judgment of the Appellate Division.

II

■ Fugitive disentitlement is a doctrine that springs out of the inherent power of courts to enforce their judgments and protect their dignity. Martha B. Stolley, *Sword or Shield: Due Process and the Fugitive Disentitlement Doctrine,* 87 *J.Crim. L. & Criminology* 751, 778–79 (1997). In essence, it provides that "a fugitive from justice may not seek relief from the judicial system whose authority he or she evades." *Id.* at 752 (footnote omitted); *see*

*also Molinaro, supra,* 396 *U.S.* at 366, 90 *S.Ct.* at 498, 24 *L.Ed.*2d at 587–88 ("No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction.").

The doctrine is rooted in the criminal law, and its most common application has been a nearly automatic bar to the criminal appeal of a defendant who has become or remains a fugitive from justice. The United States Supreme Court approved that application over a century ago. *Molinaro, supra,* 396 *U.S.* at 365–66, 90 *S.Ct.* at 498–99, 24 *L.Ed.*2d at 587 (citing *Allen v. Georgia,* 166 *U.S.* 138, 141, 17 *S.Ct.* 525, 526, 41 *L.Ed.* 949, 950 (1897); *Bonahan v. Nebraska,* 125 *U.S.* 692, 8 *S.Ct.* 1390, 1390–91, 31 *L.Ed.* 854 (1887); *Smith v. United States,* 94 *U.S.* 97, 97–98, 24 *L.Ed.* 32, (1876)); *see also Estelle v. Dorrough,* 420 *U.S.* 534, 537, 95 *S.Ct.* 1173, 1175, 43 *L.Ed.*2d 377, 380 (1975) (noting that court "has long followed the practice of declining to review the convictions of escaped criminal defendants"). Most federal and state courts have followed suit. *See, e.g., United States v. Morgan,* 254 *F.*3d 424, 427 (2nd Cir. 2001); *United States v. Hanzlicek,* 187 *F.*3d 1219, 1220 (10th Cir.1999); *Parretti v. United States,* 143 *F.*3d 508, 511 (9th Cir.), *cert. denied,* 525 *U.S.* 877, 119 *S.Ct.* 179, 142 *L.Ed.*2d 146 (1998); *United States v. Wright,* 902 *F.*2d 241, 242 (3rd Cir.1990); *United States v. Amado,* 754 *F.*2d 31 (1st Cir.1985); *People v. Elkins,* 122 *Cal.* 654, 55 *P.* 599 (1898); *Doren v. State,* 181 *Ind.* 314, 104 *N.E.* 500 (1914); *Lofton v. State,* 149 *Miss.* 514, 115 *So.* 592, *cert. denied,* 278 *U.S.* 568, 49 *S.Ct.* 83, 73 *L.Ed.* 510 (1928); *Arvey v. State,* 94 *Nev.* 566, 583 *P.*2d 1086, 1087 (1978); *People v. Jones,* 220 *A.D.*2d 535, 632 *N.Y.S.*2d 201 (N.Y.App.Div.1995); *State v. Dalton,* 185 *N.C.* 606, 115 *S.E.* 881 (1923); *State v. Bell,* 608 *N.W.*2d 232, 235 (2000); *Snyder v. State,* 90 *Okla.Crim.* 116, 210 *P.*2d 787 (1949); *State v. Spry,* 126 *W.Va.* 781, 30 *S.E.*2d 88, 90 (1944).

For fugitive disentitlement purposes, the notion of who is a fugitive includes a

person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district. *Empire Blue Cross and Blue Shield v. Finkelstein,* 111 *F.*3d 278, 281 (2d Cir.1997) (citing Black's Law Dictionary 604 (5th ed.1979)).

[*United States v. Barnette, supra,* 129 *F.*3d 1179, 1184 (11thCir.1997) (alterations in original).]

However, a defendant need not leave the jurisdiction after committing a crime to qualify as a fugitive. He may, while legally outside the jurisdiction, "constructively flee by deciding not to return." *Ibid.* (citation omitted).

It has consistently been held that the application of the doctrine of fugitive disentitlement requires that a "sufficient connection exist between defendant's fugitive status and the appellate process so as to make dismissal a reasonable sanction." *United States v. Delagarza–Villarreal,* 141 *F.*3d 133, 137 (5th Cir.1997) (citing *Ortega–Rodriguez v. United States,* 507 *U.S.* 234, 243–45, 113 *S.Ct.* 1199, 1205–06, 122 *L.Ed.*2d 581, 597 (1993)). That connection obviously exists where a defendant who has fled the jurisdiction after conviction seeks to file a criminal appeal while remaining a fugitive from justice. *Ibid.* However, in *Ortega–Rodriguez, supra,* where a defendant fled the jurisdiction after conviction but was returned to custody by the time the appeal was heard, the Supreme Court recognized that there was not a sufficient connection between defendant's prior fugitive status and the appellate process to warrant barring his resort to the courts. 507 *U.S.* at 243–45, 113 *S.Ct.* at 1205–06, 122 *L.Ed.*2d at 597. The nexus required by *Ortega–Rodriguez* is an integral part of the fugitive disentitlement doctrine.

New Jersey has long recognized the application of the fugitive disentitlement doctrine in purely criminal settings in accordance with United States Supreme Court practice. For example, in *State v. Prince,* 140 *N.J.Super.* 418, 419, 356 *A.*2d 428 (App.Div.), *appeal reinstated,* 71 *N.J.* 347, 364 *A.*2d 1079 (1976), the defendant escaped and remained at large during the pendency of his appeal. The Appellate Division dismissed the appeal. Although we ulti-

mately reinstated it for reasons that are not relevant here, the Appellate Division correctly recognized:

> [I]t is abundantly clear that a state may constitutionally "adopt a policy which deters escapes by prisoners."
>
> New Jersey formulated such a policy many years ago. An escape is a contempt of the judgment of the court ordering the confinement. While in such contempt, defendant is not entitled to the consideration of the judiciary or relief at the hands of the court.

[<em>Id.</em> at 420, 356 A.2d 428 (citations omitted).]

Similarly, in *State v. Rogers*, 90 *N.J.* 187, 189, 447 *A*.2d 537 (1982), the defendant fled the jurisdiction while his appeal was pending. The State moved to dismiss the appeal, and defense counsel argued that the important issue in the case required the Court to decide the case as though defendant were not a fugitive. *Ibid.* We declined to address the issue, noting that "[i]n most jurisdictions, courts will dismiss the appeal of a fugitive." *Ibid.*

Taking a cue from *Ortega–Rodriguez*, the Appellate Division has refused to apply the doctrine where it considered the connection between defendant's pending criminal appeal and his fugitive status too attenuated. *State v. Canty*, 278 *N.J.Super.* 80, 83, 650 *A*.2d 391 (App.Div.1994) (noting that justifications for dismissing fugitive defendant's appeal are less compelling in context of dismissing motion to suppress). Recently, we obliquely reached a similar conclusion in *State v. Fisher*, 156 *N.J.* 494, 506–07, 721 *A*.2d 291 (1998), where we held that a defendant's prior fugitive status would not warrant barring his resort to the court once he had been recaptured. Thus, where a defendant is a fugitive from criminal prosecution or conviction, the application of the fugitive disentitlement doctrine to bar him from pursuing a criminal appeal is firmly rooted in our jurisprudence.

III

In 1996, a new aspect of the fugitive disentitlement doctrine emerged when the United States Supreme Court first declared it applicable in a case in which a criminal fugitive sought not to challenge the criminal charges pending against him, but to contest

a related civil matter. In *Degen v. United States*, 517 *U.S.* 820, 821, 116 *S.Ct.* 1777, 1779, 135 *L.Ed.*2d 102, 107 (1996), a federal grand jury indicted Degen for distribution of marijuana, money laundering and other crimes, and the government sought the civil forfeiture of his properties allegedly used to facilitate, or purchased with the proceeds of, his drug sales. Degen, who had moved to Switzerland, filed an answer in the civil action to contest the forfeiture. *Id.* at 822, 116 *S.Ct.* at 1780, 135 *L.Ed.*2d at 107. The district court granted a government motion to strike Degen's answer and entered summary judgment against him, holding that he "was not entitled to be heard in the civil forfeiture action because he remained outside the country, unamenable to criminal prosecution." *Ibid.* The United States Supreme Court reversed the Ninth Circuit's decision affirming that judgment, recognizing, for the first time, the theoretical applicability of fugitive disentitlement in a civil case but holding that the doctrine does not permit the district court to automatically enter summary judgment in favor of the government in a civil forfeiture action based on a claimant's criminal fugitive status. *Id.* at 827–29, 116 *S.Ct.* at 1782–83, 135 *L.Ed.*2d at 110–12. Rather, a case specific analysis must be undertaken in order to determine whether the invocation of the fugitive disentitlement doctrine is warranted.

In so doing, the Court catalogued the five putative rationales for extending disentitlement to a civil case against a criminal fugitive: 1) risk of delay or frustration in determining the merits of the claim; 2) unenforceability of the judgment; 3) the compromising of a criminal case by the use of civil discovery mechanisms; 4) redressing the indignity visited on the court; and 5) deterring flight by criminal defendants. *Id.* at 824–28, 116 *S.Ct.* at 1781–83, 135 *L.Ed.*2d at 108–11. Rejecting each rationale on the facts before it, the Court found no risk that the district court would be delayed or frustrated in rendering an enforceable judgment because the court's jurisdiction over the property was secure. *Id.* at 825, 116 *S.Ct.* at 1781, 135 *L.Ed.*2d at 109. In addition, the Court rejected the contention that the criminal prosecution might be prejudiced by Degen's participation in the forfeiture case. Hold-

ing that there are other ways of protecting the Government's interests besides "the harsh sanction of absolute disentitlement," the Court explained:

> [Defendant's] absence entitles him to no advantage. If his unwillingness to appear in person results in non-compliance with a legitimate order of the court respecting pleading, discovery, the presentation of evidence, or other matters, he will be exposed to the same sanctions as any other uncooperative party. A federal court has at its disposal an array of means to enforce its orders, including dismissal in an appropriate case.
>
> [*Id.* at 827, 116 *S.Ct.* at 1782, 135 *L.Ed.*2d at 110.]

Although the need to deter flight from criminal prosecution and to redress the indignity visited upon the court by the petitioner's absence from the criminal proceeding are always substantial interests, the Court found that "disentitlement is too blunt an instrument for advancing them." *Id.* at 828, 116 *S.Ct.* at 1783, 135 *L.Ed.*2d at 111. "The dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits." *Ibid.* "A court's inherent power is limited by the necessity giving rise to its exercise. There was no necessity to justify the rule of disentitlement in this case; to strike [defendant's] filings and grant judgment against him would be an excessive response to the concerns here advanced." *Id.* at 829, 116 *S.Ct.* at 1783, 135 *L.Ed.*2d at 111–12.

*Degen* has been read to

> shift[ ] the emphasis from considerations of dignity, deterrence, respect, propriety, and symmetry found in a number of earlier [fugitive disentitlement] cases to the kind of practical considerations that inform the decision whether to dismiss a suit with prejudice as a sanction for mistakes, omissions, or misconduct.
>
> [*Sarlund v. Anderson,* 205 *F.*3d 973, 974 (7th Cir.2000) (citations omitted).]

## IV

No court facing the issue since *Degen* has questioned the theoretical applicability of the fugitive disentitlement doctrine to a criminal fugitive in the civil context. A close review of post-*Degen* cases reveals that the justifications advanced by *Degen* for applying the doctrine have been fully imported, and that the outcome

has depended solely on the specific facts of each case. The recurrent question in all of the cases is whether dismissal is the only method by which to remedy the judicial interests underlying the doctrine.

Post-*Degen* cases recognizing the doctrine but finding dismissal too harsh a remedy include: *Bano v. Union Carbide Corp.*, 273 *F*.3d 120, 125–26 (2nd Cir.2001) (holding doctrine not applicable to strike defendants' dispositive trial motions and affirmative defenses where defendants were fugitives from criminal prosecution in India and were present before district court; "insufficient nexus" existed between status as fugitive and civil proceedings here, and no purpose of doctrine could be served by its application); *Barnett v. Young Men's Christian Ass'n*, 268 *F*.3d 614, 618–19 (8th Cir. 2001) (holding dismissal of fugitive's Fair Labor Standards Act claims unnecessary to effectuate concerns underlying doctrine where there was "no substantial connection" between status as fugitive (arising from violation of probation) and civil case; his presence had not yet been required at any proceeding in civil case; and he had since been returned to custody); *FDIC v. Pharaon*, 178 *F*.3d 1159, 1162–63 (11th Cir.1999) (holding fugitive disentitlement doctrine, without more, inappropriate basis to strike answer and bar criminal fugitive from defending himself in related civil case, and noting that fugitive's absence gave him no advantage); *Magluta v. Samples*, 162 *F*.3d 662, 664 (11th Cir.1998) (finding abuse of discretion in dismissal of criminal fugitive's civil action challenging conditions of prior confinement on unrelated charges, where there was "no nexus" between civil case and fugitivity from passport fraud conviction and no indication that fugitive had failed to comply with any order issued in civil case); *Cooper v. Villaburdi*, No. 00C–08–174JEB (Del.Super.Ct. Oct.2, 2001), *available at* 2001 *WL* 1198933, at \*2 (recognizing inherent authority to apply doctrine "reasonably and with restraint," but declining to dismiss fugitive plaintiff from case where entire matter dismissed for failure to state a claim); *Holland v. United States*, 44 *Mass.App. Ct.* 280, 690 *N.E.*2d 463, 465 (1998) (reversing for reconsideration trial court's strict application of doctrine to bar sister of fugitive

from petitioning for appointment as receiver of fugitive's property subject to forfeiture proceedings). *But see Sarlund v. Anderson,* 205 *F*.3d 973, 975 (7th Cir.2000), which upheld the dismissal of a criminal fugitive's civil rights action against law enforcement officers because the fugitive's absence would severely prejudice the defendants, and "nothing short of dismissal of his suit" would protect the defendants and prevent the fugitive from "using the litigation process to harass the defendants with impunity."

*Degen* also spawned a sub-set of fugitive disentitlement cases arising purely in a civil setting. Those decisions expanded the concept of who is a fugitive for the purpose of applying the doctrine:

> It has been held that "a fugitive from justice need not be a fugitive in a criminal matter." [*Empire Blue Cross and Blue Shield v. Finkelstein, supra,* 111 *F*.3d at 281.] In *Finkelstein,* the Second Circuit, looking at this definition of fugitive, ruled that defendants in an entirely civil matter, facing a large judgment, were fugitives for purposes of the doctrine because they "continued to evade arrest." *Id.* at 282 (defendants' whereabouts unknown after issuance of bench warrants for failing to appear at depositions and to comply with court orders). *See also Perko v. Bowers,* 945 *F*.2d 1038 (8th Cir.1991) (doctrine can be applied in civil cases); *United States v. Van Cauwenberghe,* 934 *F*.2d 1048 (9th Cir.1991) (doctrine can be applied to quasi-criminal or civil cases). Under certain circumstances the disentitlement doctrine may be even more applicable to civil than criminal cases: because a defendant-appellant's liberty is not at stake, less harm can come from the refusal to entertain the appeal. *See Conforte v. Commissioner,* 692 *F*.2d 587, 589 (9th Cir.1982).
>
> [*United States v. Barnette, supra,* 129 *F*.3d at 1183 (11th Cir.1997).]

Among the federal cases recognizing the theoretical applicability of the doctrine in a purely civil setting are *Goya Foods, Inc. v. Unanue–Casal,* 275 *F*.3d 124, 129 (1st Cir.2001) (dismissing appeal of fugitive judgment debtor and his wife from orders of contempt and execution of judgment where fugitives "connived at violating the orders, enriched themselves by $4.2 million, and then fled the jurisdiction"; flight was from same proceeding in which contempt orders issued; and appeals themselves were without merit and designed to frustrate and delay enforcement of judgment); *Pesin v. Rodriguez,* 244 *F*.3d 1250, 1252–53 (11th Cir.2001) (applying doctrine to dismiss appeal by mother of grant of father's Hague Convention petition for child custody where mother had absconded

with children and their whereabouts were unknown, continued to defy court orders to return children, continued to evade arrest, and would likely defy any adverse ruling); *Walsh v. Walsh,* 221 *F.*3d 204, 215–16 (1st Cir.2000) (declining to apply doctrine to dismiss father's petition under Hague Convention for return of children from mother who had taken them away with her to United States; practical considerations of doctrine not strong enough to warrant application in case involving parental rights, there was no showing that his status as fugitive impaired rights of mother, and all Hague Convention petitions involve enforcement difficulties because by definition one party lives in foreign jurisdiction); *March v. Levine,* 136 *F.Supp.*2d 831, 856–60 (M.D.Tenn. 2000) (refusing to dismiss father's Hague Convention petition for return of children from their grandparents where father held in contempt after lawfully moving to Mexico; application of doctrine "far too harsh" in case involving parental rights where *Degen* rationales of enforceability, protecting dignity of court, and preventing risk of delay or frustration would not be advanced), *aff'd,* 249 *F.*3d 462 (6th Cir.2001); *United States v. Barnette, supra,* 129 *F.*3d at 1184–86 (dismissing appeal from civil contempt order issued against wife of convicted criminal defendant for failing to comply with discovery requests and orders to pay balance of prior forfeiture judgment against husband where wife's fugitive status effected an unauthorized stay of contempt judgment thus making enforcement impossible); *Finkelstein, supra,* 111 *F.*3d at 282 (dismissing defendants' appeal of civil judgment where status as fugitives from civil court orders and bench warrants for failure to respond to post-judgment discovery to assist judgment collection affected judgment from which they sought to appeal; fugitivity rendered enforcement of civil judgment impossible and nothing short of dismissal could minimize prejudice to plaintiffs in light of fact that defendants' whereabouts were unknown).

Various state courts also have applied the doctrine in purely civil cases. *Guerin v. Guerin,* 993 *P.*2d 1256, 1258 (Nev.2000) (dismissing appeal of divorce decree by wife evading arrest pursuant to bench warrant and contempt orders issued for failure to

transfer real property to husband); *Scelba v. Scelba*, 342 *S.C.* 223, 535 *S.E.*2d 668, 671–73 (Ct.App.2000) (barring appeal of divorce decree by wife where she was in contempt for failing to abide by family court orders to account for and return property and willfully failed to appear at deposition, and bench warrant still outstanding for her arrest; nexus between fugitive status and appeal strong, and so long as wife remained fugitive "the husband has no practical means of enforcing the final divorce decree").

If the cited cases were to be boiled down to their essence, it would be this: the fugitive disentitlement doctrine is an arrow in the judicial quiver that can be let loose in a criminal or civil case so long as the party's fugitive status is sufficiently connected to the litigation in which the doctrine is sought to be invoked and so long as nothing less than dismissal will suffice. What is crucial is the inquiry into whether an alternative short of dismissal will render enforcement of the underlying judgment certain and remove the risk of prejudice to the fugitive's adversary. If so, the only remaining relevant rationales for application of the doctrine are: (i) redressing the indignities visited upon our courts by the fugitives' absence and refusal to comply with lawful court orders; and (ii) deterring flight from criminal prosecution. *Degen, supra,* 517 *U.S.* at 828, 116 *S.Ct.* at 1783, 135 *L.Ed.*2d at 111. *Degen* instructs us that those goals, while laudable, are insufficient to warrant the rough justice that would be visited upon the fugitive by precluding consideration of his or her appeal on the merits.

## V

Our courts have not previously been called upon to determine the applicability of the fugitive disentitlement doctrine to a civil case. We have no hesitation in doing so now in light of the great weight of well-reasoned federal and state authority on the subject and our prior adherence to the doctrine in criminal cases. *State v. Prince, supra,* 140 *N.J.Super.* at 419, 356 *A.*2d 428; *State v. Rogers, supra,* 90 *N.J.* at 190, 447 *A.*2d 537. The inquiry is not whether the order flouted is criminal or civil, or

whether the case in which the doctrine is sought to be invoked is criminal or civil.  In our view, it is the flight or refusal to return in the face of judicial action that is the critical predicate to fugitive disentitlement.  We view the application of the doctrine in a civil case as a natural progression of the law.

■  We adopt as our guide the following standards that we have distilled from relevant case law:  the party against whom the doctrine is to be invoked must be a fugitive in a civil or criminal proceeding;  his or her fugitive status must have a significant connection to the issue with respect to which the doctrine is sought to be invoked;  invocation of the doctrine must be necessary to enforce the judgment of the court or to avoid prejudice to the other party caused by the adversary's fugitive status;  and invocation of the doctrine cannot be an excessive response.  *Degen, supra,* 517 *U.S.* at 824–28, 116 *S.Ct.* at 1781–83, 135 *L.Ed.*2d at 108–11; *Walsh, supra,* 221 *F.*3d at 215–16.  *See also Goya Foods, Inc., supra,* 275 *F.*3d at 129 (noting that fugitive disentitlement doctrine is "discretionary rather than automatic and to be applied with caution").  That is the backdrop against which our evaluation of this case must take place.

## VI

■  Our analysis begins with the observation that both Tatsuya and Kazuko plainly are criminal fugitives insofar as criminal indictments have been returned against them and bench warrants have issued upon their failure to appear for arraignment.  Both Tatsuya and Kazuko are aware of the charges pending against them, but have continued to remain outside the jurisdiction of the court.

Tatsuya and Kazuko apparently believe, after keeping Hyugo away from Satoko for eighteen months and refusing any communication from her, resulting in Hyugo's total estrangement from his mother, that the slate was wiped clean and the criminal indictments rendered irrelevant when they put him on a plane and dropped him at Newark Airport.  That is neither the fact nor the

law. A person who has kidnapped or harbored a kidnapped victim is not absolved of wrongdoing when the victim is returned. The indictments required Tatsuya and Kazuko to answer for their conduct during the time that Hyugo was in their custody in Japan. They have declined to do so. Thus, their criminal fugitive status based upon their refusal to return is clear. *United States v. Barnette, supra,* 129 *F.*3d at 1184.

■ Because the criminal indictment flowed solely from Hyugo's custody, Tatsuya and Kazuko argue alternatively that there is no reason to preclude them from appealing purely civil orders entered in connection with the divorce. More particularly, at issue are custody, the equitable distribution award of the marital home to Satoko, the order granting Satoko $944,500 in marital assets, the permanent alimony and child support awards, the compensatory and punitive damages awards for interference with custody, and attorneys' fees.

What is initially presented is an *Ortega–Rodriguez* question. Are the civil orders Tatsuya and Kazuko seek to appeal sufficiently connected to their fugitive status to make invocation of the fugitive disentitlement doctrine appropriate? If that question is answered affirmatively, we must resolve whether dismissal is a reasonable sanction necessary to enforce the judgment or avoid prejudice to Satoko.

We begin with Tatsuya. Part of what made it possible for Tatsuya to live in Japan with Hyugo for eighteen months, contrary to the court's orders that he return the boy, was that Tatsuya took all of the marital assets with him and retained all of the money he had been ordered to pay as alimony to Satoko. His access to those assets, and the concomitant fact that he had no fear of losing the marital assets in the divorce action, clearly paved the way for him to spend those months away from the United States secreting Hyugo from his mother. Thus, there is an intimate connection between Tatsuya's fugitive status and the disposition of the matrimonial estate and the alimony award. Likewise, the compensatory and punitive damages judgments and counsel fee awards were

imposed specifically for Tatsuya's acts of interference with custody and are related directly to the subject of the indictment from which he is a fugitive. More importantly, Tatsuya is also a civil fugitive in the very appeal that is pending. He was ordered to return what he took when he denuded the marital estate and has refused to do so, evading sanctions by remaining outside the jurisdiction of the court.

■ What remains is the question of whether dismissal is "too blunt an instrument" under the circumstances. Because Tatsuya plundered the marital estate, he has no assets here to satisfy any judgment entered against him.[1] Thus, his appeal should not be permitted to proceed unless conditions are imposed to avoid prejudice to Satoko and to ensure enforcement of any judgment. However, we think a lesser remedy than disentitlement could satisfy all of the interests involved. Accordingly, if Tatsuya wishes to appeal the relevant orders, he may do so if he posts a bond in the full amount of the judgments pending against him to assure the enforceability thereof and to avoid prejudice to Satoko. Indeed, because he has effected, by self-help measures, a stay of the trial court judgment, a bond would be appropriate under the Court Rules. *R.* 2:9–5(a) (providing for stay of civil judgment of money or property disposition "only upon the posting of a bond pursuant to *R.* 2:9–6 or a cash deposit pursuant to *R.* 1:13–3(c)"). If Tatsuya chooses not to post such a bond, the fugitive disentitlement doctrine will be applied to continue the dismissal of his appeal.

■ There is one additional, distinct issue relative to Tatsuya that requires disposition: his appeal of the custody award. As has been previously discussed, Tatsuya ultimately returned Hyugo to

---

[1] It cannot be said with certainty that a judgment rendered by our courts against Tatsuya will be enforceable in Japan. Allan R. Stein, *The Unexceptional Problem of Jurisdiction in Cyberspace*, 32 *Int'l Law.* 1167, 1190 n. 109 ("[I]f the defendant does not own assets in the United States, it may be difficult or impossible for the plaintiff to collect on the judgment; there are currently few treaty obligations to enforce United States judgments in other countries.")

the United States in accordance with the trial court's order, thus rendering him compliant with that order. Since that time, with Satoko's consent, Hyugo has returned to Japan for school. The trial court order granted sole custody to Satoko along with child support.[2] Although he was granted the right to cross-examine Satoko's witnesses at the custody hearing, Tatsuya was not allowed to present a case. It is that limitation on his participation and the resulting custody order that he seeks to appeal.

Custody is in an entirely different category than other issues for fugitive disentitlement purposes. We have long recognized that the child's best interests are paramount in child custody matters. *Baures v. Lewis,* 167 *N.J.* 91, 115, 770 *A.*2d 214 (2001) ("[T]he ultimate judgment [of custody] is squarely dependent on what is in the child's best interests.") (citing *Kinsella v. Kinsella,* 150 *N.J.* 276, 317, 696 *A.*2d 556 (1997); *Fantony v. Fantony,* 21 *N.J.* 525, 536, 122 *A.*2d 593 (1956) ("Our law in a cause involving the custody of a minor child is that the paramount consideration is the safety, happiness, [and] physical, mental and moral welfare of the child.")). Part and parcel of such a determination is the full participation of both parents in the process so that the court has before it all relevant evidence regarding what custody award would best serve the child's interest. *See Benda v. Benda,* 122 *N.J.* 174, 175, 584 *A.*2d 238 (1990) (ordering that mother be allowed full participation in Indiana child custody hearings "without any prior determination of contempt for violation of past orders"); *Hinton v. Searles,* 53 *Ill.App.*3d 433, 11 *Ill.Dec.* 329, 368 *N.E.*2d 937, 941 (1977) (viewing as suspect foreign state decision modifying child custody order in favor of father because without presence of mother and children at proceeding "there could be no informed decision of what action was in the best interests of the children").

---

[2] Because the child support issue is dependent on custody, it need not be separately addressed.

■ Moreover, we have consistently recognized that a parent's right to the custody and companionship of his or her child is a fundamental one. *V.C. v. M.J.B.*, 163 *N.J.* 200, 218, 748 *A*.2d 539 (2000); *Watkins v. Nelson*, 163 *N.J.* 235, 245, 748 *A*.2d 558; *New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 617, 512 *A*.2d 438 (1986); *accord Walsh, supra*, 221 *F*.3d at 216 ("[U]nder the [United States] Constitution, parents have a fundamental interest in their relationships with their children."). Such a right cannot be extinguished or limited because of litigation misbehavior. *Sheehan v. Sheehan*, 38 *N.J.Super.* 120, 127, 118 *A*.2d 89 (App.Div.1955) (holding that fact that mother may have been in contempt for removing children from Maryland "should not of itself be grounds to award custody to [father]") (following *In re Shaheen*, 127 *N.J.Eq.* 75, 76–77, 11 *A*.2d 73 (1940) (holding that contempt of mother must be adjudged separate and apart from best interests of child; "punishment of her contumacy . . . should not have struck through the child")); *accord Hinton, supra*, 11 *Ill.Dec.* 329, 368 *N.E*.2d at 941 (holding that mother's status as fugitive from justice irrelevant to best interests of child and thus never should play role in "proper custody determination"). Indeed, it has been held that "applying the fugitive disentitlement doctrine would impose too severe a sanction in a case involving parental rights." *March v. Levine, supra*, 136 *F.Supp.*2d at 859 (quoting and following *Walsh, supra*, 221 *F*.3d at 216).

Given those principles, whatever limits the fugitive disentitlement doctrine might impose in other settings would not be applicable in a custody case in which no enforcement issue exists. To be sure, like courts in other jurisdictions, we would impose the doctrine in a case in which the fugitive parent has removed or hidden the child, thereby making enforcement improbable in the event of a decision unfavorable to the fugitive parent. *See, e.g., Pesin v. Rodriguez, supra*, 244 *F*.3d at 1253 (applying fugitive disentitlement doctrine to dismiss appeal of mother in hiding with children where "her behavior to date leaves little doubt that she would defy an adverse ruling"). That is not the case here. Thus,

under *Degen* and *Walsh*, no interest would be served by application of the doctrine of fugitive disentitlement to dismiss the custody aspect of Tatsuya's appeal.

■ We turn next to Kazuko. Clearly the compensatory and punitive damages awards and the counsel fee award against Kazuko are fully related to her fugitive status under the indictments. As in the case of Tatsuya, those sanctions were imposed because of the allegations regarding Kazuko's actions vis-a-vis Hyugo, who lived with her in Japan despite court orders that he be returned. Those judgments total over $400,000, and an appeal with respect to them is sufficiently connected to Kazuko's fugitive status within the meaning of *Ortega–Rodriguez*. Thus, the only question is whether dismissal is too heavy-handed a remedy. If the appeal were to proceed, and Kazuko remained liable for the punitive, compensatory and counsel fee awards, there is no security for those judgments. Thus, enforcement of the court's lawful orders could not be guaranteed and, after being required to participate in the appellate process, Satoko would have a hollow victory. As with Tatsuya, however, we think a lesser sanction will suffice. If Kazuko separately bonds the punitive and compensatory damages judgments and the counsel fee award, thus rendering any order of the court enforceable, she may proceed with her appeal.[3] Failing that, it will remain dismissed.

■ Kazuko's claim regarding her house in Cedar Grove presents a slightly different problem. She argues that the allocation of the house to Satoko as part of equitable distribution is totally unrelated to the charges in the indictment from which she is a fugitive. That is a debatable issue based upon her course of dealing with Satoko and Tatsuya. However, it need not be

---

[3] Although the determination of personal jurisdiction over Kazuko remains the law of the case, *State v. Reldan*, 100 N.J. 187, 203–04, 495 A.2d 76 (1985), on appeal she will be free to argue that her lack of legal authority over Hyugo during his stay in Japan undermines the orders entered against her for interference with child custody.

resolved at this juncture because, even if it could be said that the distribution of Kazuko's house is connected to her fugitive status within the meaning of *Ortega–Rodriguez*, barring her access to the court would not be appropriate. Because the proceeds from the sale of the house have been held in escrow by counsel in New Jersey to secure enforcement (and have been partially distributed to Satoko), there is no reason to bar Kazuko's appeal on that issue.[4]

## VII

The fugitive disentitlement doctrine, as we have described it, is an instrument for the effectuation of justice through the enforcement of the court's orders against those who have evaded them by fleeing either physically or constructively. The standards we have adopted for the application of the doctrine guarantee that it will not be misused and that, where a lesser remedy assures the enforceability of our judgments along with practical equity to the adversary, dismissal will not occur. Fugitive disentitlement is not a punishment but an exercise of the court's inherent power that should be sparingly invoked, because remedies that bar consideration of claims on the merits are, in the main, contrary to our notions of justice.

## VIII

The judgment of the Appellate Division is affirmed but modified to allow Tatsuya and Kazuko to appeal the damages and counsel fee awards against them so long as they provide the security that we have required. If they fail to do so, those aspects of their appeals will remain dismissed. Tatsuya may nonetheless appeal

---

[4] It may be that Kazuko will choose not to secure the damages judgments against her and appeal only from the award of the house to Satoko. Should that occur and should Kazuko prevail on that appeal, the trial court may look to proceeds of the sale of the house to satisfy the outstanding damages award against Kazuko.

the determination of child custody and the related support award. Kazuko may appeal the award of the house to Satoko.

VERNIERO, J., dissenting.

I would affirm the judgment of the Appellate Division substantially for the reasons expressed in Judge Stern's meticulous opinion. *Matsumoto v. Matsumoto*, 335 *N.J.Super.* 174, 762 *A.*2d 224 (2000). Defendants spurned the civil orders of the trial court, and they remain at large under existing arrest warrants. Consequently, the Appellate Division dismissed their appeals "without prejudice to reinstatement upon surrender of the defendants and/or vacation of the warrants now outstanding against them." *Id.* at 186, 762 *A.*2d 224 (footnote omitted). That disposition is eminently fair under the circumstances.

While remaining beyond the reach of New Jersey's law enforcement authorities, each defendant is permitted by the Court to post a bond and, in so doing, to prosecute his or her civil appeal. Like the majority, I favor employing the fugitive disentitlement doctrine fairly and equitably in all cases. However, I disagree with my colleagues in their formulation of the standard to be used when deciding whether to apply the doctrine in these and future circumstances. In a nutshell, I believe that the Court's approach may limit the doctrine so severely that it is rendered useless.

As a general rule, the doctrine does not apply "[a]bsent some connection between a defendant's fugitive status and his appeal[.]" *Ortega–Rodriguez v. United States*, 507 *U.S.* 234, 249, 113 *S.Ct.* 1199, 1208, 122 *L.Ed.*2d 581, 597 (1993). Such a connection exists in this case. The charges lodged against defendants as contained in the indictment (conspiracy to interfere with custody, interfering with custody, and endangering the welfare of a child) are related directly to one or more aspects of plaintiff's civil action.

The criminal indictment also provides the basis to apply the doctrine in respect of any appeal from the trial court's custody order. Unlike the majority, I cannot conclude so readily that defendants would comply with an adverse custody ruling in the

absence of their returning to New Jersey with the child and submitting to this State's jurisdiction. Indeed, defendants' conduct to date belies any such prospect of compliance. As indicated in the majority opinion, defendants refused all letters and gifts sent to the child by plaintiff during the initial period when the child remained in Japan. Not surprisingly, mother and child became estranged. Under those circumstances, I do not interpret the child's short-lived stay in New Jersey in July 1998 as a reliable indication of defendants' willingness to comply with the custody order. In my view, then, neither *Pesin v. Rodriguez*, 244 *F*.3d 1250 (11th Cir.2001), nor the other cases cited by the majority, require the Court's disposition.

The Court's approach in permitting a fugitive to avoid application of the doctrine by posting a bond is attractive on the surface: it provides a mechanism to fund any judgment in favor of plaintiff should she prevail on appeal. Although that disposition may enhance this one plaintiff's ability to collect a monetary award, it diminishes the ability of the system as a whole to bring fugitives to justice. Perhaps this is a hard choice, but the Court should favor strengthening the system over enhancing the collection efforts of any one litigant. That choice, however, is not difficult here because plaintiff has not sought the Court's remedy. She asks only that we affirm the judgment below.

One aspect of the procedural history bears repeating. The Appellate Division dismissed defendants' appeal *without* prejudice. Thus, the harshness feared by post-*Degen* courts such as *Sarlund v. Anderson*, 205 *F*.3d 973, 974 (7th Cir.2000), in which the Seventh Circuit addressed "whether to dismiss a suit *with* prejudice as a sanction for mistakes, omissions, or misconduct[,]" (emphasis added), simply does not exist in this case. The Appellate Division's disposition has not closed the doors to the courthouse; it has left them quite ajar. Defendants need only comply with all existing warrants and return the child to New Jersey to prosecute their civil appeals.

In sum, this is not an instance in which a criminal defendant is being denied access to our courts to appeal a wholly unrelated civil judgment. Both civil and criminal warrants remain outstanding against defendants, and the warrants are based essentially on the same conduct. Stated differently, all aspects of plaintiff's civil matter, including child custody issues, are inextricably linked to the outstanding warrants and pending criminal allegations. The record, therefore, justifies application of the doctrine in this case. We should not permit defendants simply to post a bond to gain the benefit of our civil courts while they continue to spurn the civil warrants and avoid answering the criminal indictment. I respectfully dissent.

*For affirmance as modified*—Chief Justice PORITZ, Justices STEIN, LONG, LaVECCHIA and ZAZZALI—5.

*For affirmance*—Justices COLEMAN and VERNIERO—2.

*Opposed*—None.