Filed:  July 30, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 01-1628
(CA-00-1913-A)

---

Sidney L. Jaffe, et al.,

                              Plaintiffs - Appellants,

        versus

Accredited Surety and Casualty Co., Inc.,

                              Defendant - Appellee.

---

O R D E R

---

The court amends its opinion filed June 25, 2002, and reported at 294 F.3d 584, as follows:

On page 4, first full paragraph, lines 18-19 -- the clause "Jaffe again immediately fled to Canada" is corrected to read "Jaffe immediately fled to Canada."

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                                      Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SIDNEY L. JAFFE; RUTH JAFFE,
    *Plaintiffs-Appellants,*

    v.

ACCREDITED SURETY AND CASUALTY                No. 01-1628

COMPANY, INCORPORATED,
    *Defendant-Appellee.*

CENTER FOR CONSTITUTIONAL RIGHTS,
    *Amicus Curiae.*

Appeal from the United States District Court

for the Eastern District of Virginia, at Alexandria.

Gerald Bruce Lee, District Judge.

    (CA-00-1913-A)

 Argued: February 26, 2002

    Decided: June 25, 2002

Before MOTZ, KING, and GREGORY, Circuit Judges.

_____

Affirmed in part and certified in part by published opinion. Judge
Motz wrote the opinion, in which Judge King and Judge Gregory
joined.

_____

## COUNSEL

**ARGUED:** Harold M. Jaffe, Oakland, California, for Appellants.
Michael Lee Sturm, WILEY, REIN & FIELDING, L.L.P., Washing-
ton, D.C., for Appellee. **ON BRIEF:** David Barger, KILPATRICK

STOCKTON, Reston, Virginia, for Appellants. Fred F. Fielding, Leslie D. Fetter, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Appellee. Jennifer Green, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York; William J. Aceves, CALIFORNIA WESTERN SCHOOL OF LAW, San Diego, California, for Amicus Curiae.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In this diversity action, Sidney Jaffe and his wife, Ruth Jaffe, Canadian citizens now living in Mexico, seek recognition of two default judgments — one in favor of Sidney Jaffe and one in favor of Ruth Jaffe. A Canadian court entered the default judgments against Accredited Surety & Casualty Co., Inc. (Accredited), a Florida corporation doing business in Virginia. The Canadian default judgments arise from the Jaffes' contention that, after Sidney Jaffe jumped bail on Florida criminal charges, bail bondsmen employed by Accredited "kidnapped" him in Canada and illegally transported him to Florida for trial.

The district court refused to recognize the Canadian default judgments and granted summary judgment to Accredited. Because we must give full faith and credit to a Florida court's previous judgment refusing to recognize Ruth Jaffe's Canadian default judgment, we affirm the district court's grant of summary judgment to Accredited with respect to Ruth Jaffe's default judgment. However, because Virginia law is unclear as to whether the claim for relief on which Sidney Jaffe's default judgment is based "is repugnant to the public policy" of Virginia, or otherwise "need not be recognized" under Virginia's Foreign Country Money-Judgments Recognition Act, Va. Code Ann. § 8.01-465.6 et seq. (Michie 2000), we respectfully certify that question to the Supreme Court of Virginia.

### I.

On August 7, 1980, Sidney Jaffe was arrested in Florida and charged with 28 counts of violating the Florida Uniform Land Sales

2

Practices Law, as codified at Fla. Stat. ch. 498.001 et seq. (1979). *See Jaffe v. State*, 438 So.2d 72, 74 (Fla. Dist. Ct. App. 1983). These charges stemmed from Jaffe's involvement in allegedly fraudulent real estate transactions in which he delivered quit-claim (rather than warranty) deeds to 28 purchasers of subdivision lots located in Putnam County, Florida. At the time Jaffe was charged with violating the Land Sales Practices Law, a civil lawsuit filed by the purchasers of the properties had been pending in Florida state court for more than two years.

Jaffe was released on $137,500 bond, which Accredited posted on Jaffe's behalf. Jaffe signed a bond agreement with Accredited providing that Accredited had the right to "apprehend, arrest and surrender" Jaffe in the event Jaffe left the Florida jurisdiction "without the written consent of the court and [Accredited]" or if Jaffe moved from his then-current residence without notifying Accredited.

Once free on bail, Jaffe fled with family members to Toronto, Canada, without notifying or obtaining the permission of the court or Accredited. Jaffe subsequently failed to appear for trial in Florida, scheduled for May 18, 1981. At that time, Jaffe's counsel presented evidence to the Florida court that Jaffe's failure to appear was attributable to a basketball injury Jaffe had suffered in Canada. The Florida court added a failure to appear charge to the original charges against Jaffe and issued a warrant for Jaffe's arrest. The Florida court also estreated, or took away, Jaffe's bond based on his failure to appear. Accredited sought to have the estreature set aside, reiterating the representation by Jaffe's counsel that Jaffe's failure to appear was due to a basketball injury. On September 18, 1981, the court agreed to set aside the estreature on the condition that Accredited produce Jaffe within ninety days.

Later that month, two Accredited bondsmen, posing as police officers, located and apprehended Jaffe at his condominium building in Toronto, Canada, as he returned from jogging. The bondsmen then took Jaffe by car across the international border to Niagara Falls, New York, and returned with him by airplane to Florida. Jaffe stood trial and, on October 23, 1981, was convicted on all 28 Land Sales Practices counts and one count of failing to appear. *See Jaffe v. State*, 438 So.2d at 74.

3

A number of legal developments occurred over the course of the next two years, during which Jaffe served sentences on the above convictions. First, in April 1982, in the civil action related to the quitclaim deeds the Florida state court entered judgment against Jaffe's corporations in the amount of $3 million, which was affirmed on appeal. Then, in July 1983, Jaffe was charged with eight counts of criminal "organized fraud," again related to the allegedly fraudulent land deals. *See Jaffe v. Sanders*, 463 So.2d 318 (Fla. Dist. Ct. App. 1984) (holding that the prior convictions did not bar — by collateral estoppel or double jeopardy — prosecution of criminal fraud charges against Jaffe). Two months later, in September 1983, a state appellate court set aside Jaffe's convictions on the Land Sales Act convictions due to "defective" wording in the indictment; however, the court upheld his failure to appear conviction. *See Jaffe v. State*, 438 So.2d at 75-77. That same month, Jaffe became eligible for parole on the failure to appear conviction and also filed a letter of credit in lieu of bond in the amount of $150,000 with respect to the criminal fraud charges. When released the next month on parole, Jaffe immediately fled to Canada.

Florida authorities filed more criminal charges against Jaffe in March 1984, while Jaffe continued to reside in Canada. This time, Jaffe was charged with four counts of perjury stemming from answers to interrogatories in both the state civil action and in a subsequent federal civil action brought by Jaffe relating to the allegedly fraudulent land deals.[1]

In the meantime, Canadian officials "took a very jaundiced view" of the bondsmen's arrest of Jaffe, who had since become a Canadian citizen, in Canada, without notice or surrender to Canadian officials. *See Kear v. Hilton*, 699 F.2d 181, 182-83 & n.1 (4th Cir. 1983) (denying habeas relief to Accredited bondsman seeking to prevent his extradition to Canada for kidnapping Jaffe). Contrary to the law in each of the United States, in Canada a surety must either obtain an order from a Canadian court permitting the arrest of the accused or must surrender the accused to Canadian peace officers. *Id.* at 182 &

_____

[1] An arrest warrant for Jaffe on these perjury charges remains outstanding, although the organized fraud charges brought in 1983 apparently were dropped sometime in 1996 or 1997.

4

n.3 (citing Criminal Code, *R.S.C.* ch. C-34, §§ 449, 700(1), 702 (1970) (Can.)). At the request of Canadian authorities, the two Accredited bondsmen were extradited to Canada and were charged and convicted there of criminal kidnapping.

On September 20, 1985, after a Canadian court had convicted the bondsmen, the Jaffes filed a civil suit in the Ontario Court of Justice against Accredited and its president, Hank M. Snow.[2] The Jaffes alleged that the bondsmen kidnapped Sidney Jaffe in violation of Canadian law, "struck [Jaffe] on the head, threatened him with further physical harm, handcuffed him, and threatened to kill members of his family in order to prevent his escaping." In the same action, the Jaffes also sued a host of other persons whom they alleged caused or conspired in the "wrongful abduction" or "wrongful imprisonment," including various Florida state attorneys, local government and county officials in Putnam County, and the attorneys who litigated the civil suit against Jaffe's corporations.

Accredited and Snow entered special appearances and filed a motion to dismiss for lack of personal jurisdiction and forum non conveniens; the Canadian court dismissed that motion. *See Jaffe v. Miller*, [1989] 76 O.A.C. 15. Accredited and Snow elected not to defend further against the action. On November 22, 1990, the Canadian court entered two default judgments against Accredited — one in favor of Sidney Jaffe for $617,434.17 in Canadian dollars, plus $290,140.94 in U.S. dollars, plus interest, and a second and separate default judgment in favor of Ruth Jaffe for $115,293.56 in Canadian dollars, plus $903,481.47 in U.S. dollars, plus interest.[3]

_____

[2] In 1982 and 1984 the Jaffes had filed civil actions in the United States based on allegations that the Accredited bondsmen had illegally kidnapped and mistreated Jaffe. The Jaffes voluntarily dismissed the first action and did not prosecute the second.

[3] These values are expressly set forth in the Canadian judgment. Nonetheless, the Jaffes claim that the Canadian court awarded Sidney Jaffe "413,806.47 U.S. Dollars and $822,956.45 Canadian Dollars," plus post-judgment interest, and awarded Ruth Jaffe "$1,401,570.80 U.S. Dollars and $177,752.30 Canadian Dollars," plus post-judgment interest.

5

On January 15, 1991, Ruth Jaffe filed an action in Florida state court seeking recognition of her Canadian default judgment. The Florida court refused recognition, reasoning that to do so would contravene Florida public policy because Florida law "favors and sanctions the apprehension of a bond jumper" by a surety, like Accredited, and because Jaffe's criminal act in failing to appear constituted the direct cause of the bondsmen's actions. *Jaffe v. Snow*, No. CI 91-1593, at 8-9 (Fla. Cir. Ct. July 26, 1991) (order granting summary judgment). The court concluded that Ruth Jaffe was not entitled to recognition of her Canadian default judgment because "the claim upon which it was based was intertwined with, solely derivative of and utterly dependent upon that of her husband." *Id.* For these reasons, the Florida trial court granted summary judgment to Accredited; the Florida appellate court affirmed. *Jaffe v. Snow*, 610 So.2d 482 (Fla. Dist. Ct. App. 1992).

In 1994, a Canadian court, after a full trial, issued a comprehensive, 93-page decision resolving the Jaffes' claims as to the remaining defendants in the Jaffes' Canadian action. The same court that previously had entered the default judgments in favor of the Jaffes (speaking through a different judge) dismissed each of the Jaffes' claims and entered judgment in favor of one defendant on his counterclaim against the Jaffes. The Canadian court spared little scorn in detailing the Jaffes' lack of credibility and the minimal foundation supporting their claims.[4] As to the earlier default judgments entered against Accredited and Snow, the court declared that "[i]t strikes me as being wrong that Jaffe now has or should obtain a judgment against Accredited" based on his allegations of "kidnapping." The court further stated:

> I have no doubt that [the other judge of this court] granted judgment in favor of both Jaffe and Mrs. Jaffe on the basis of misstatements or misrepresentations knowingly made to him . . . and allow[ed] a recovery of money to which neither of them are entitled. I have a serious concern about this mat-

_____

[4] For example, the court stated that "I can say without any hesitation that in all my years on the Bench, I have not seen or experienced a more untrustworthy witness or litigant [than Jaffe]. . . . There is absolutely no justification whatsoever for this action, let alone this [ten-week] trial, having taken place."

6

ter and question whether the judgments [in favor of the Jaffes] should now be enforced. I think the matter of their validity should be the subject of further consideration on another occasion.

On November 16, 2000, the Jaffes nonetheless filed this enforcement action against Accredited in the United States District Court for the Eastern District of Virginia, after having withdrawn a similar action from a Virginia state court in 1996. The Jaffes sought enforcement of both Canadian default judgments pursuant to the Foreign Country Money-Judgments Recognition Act, Va. Code Ann. § 8.01-465.6 et seq.

The district court granted summary judgment to Accredited. The district court reasoned that the Florida court's refusal to recognize the Canadian default judgment barred Ruth Jaffe's claim for recognition of the same default judgment. The court held that Sidney Jaffe could not succeed on his claim for recognition of his Canadian default judgment because to permit this would be repugnant to Virginia public policy and therefore was barred by Va. Code Ann. § 8.01-465.10. The district court explained that "[s]uch recovery would be against public policy because it would permit Sidney Jaffe to benefit from his wrong doing," i.e., his bail-jumping, and allow a "fugitive" to "utiliz[e] the American justice system to his benefit."

Both Jaffes appeal. We review the district court's grant of summary judgment de novo. Guinness PLC v. Ward, 955 F.2d 875, 882 (4th Cir. 1992). We consider first Ruth Jaffe's claim and then Sidney Jaffe's claim.

## II.

The full faith and credit statute, 28 U.S.C.A. § 1738 (West 1994), governs our disposition of Ruth Jaffe's claim. That statute requires that federal courts afford state court judgments "full faith and credit." *Id.* (providing that state judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken").

7

To determine whether the full faith and credit statute applies in a particular case, a court engages in a two-step inquiry. *Meindl v. Genesys Pac. Techs., Inc. (In re Genesys Data Techs., Inc.)*, 204 F.3d 124, 128 (4th Cir. 2000) (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 381 (1985)). First, we "must refer to the preclusion law of the State in which the judgment was rendered" to ascertain the preclusive effect of the state-court judgment in that state. *Heckert v. Dotson (In re Heckert)*, 272 F.3d 253, 257 (4th Cir. 2001) (internal quotation marks and citation omitted); *Meindl*, 204 F.3d at 128. If the law of that state "would not bar relitigation of an issue or claim decided in the earlier proceeding, then the inquiry ends — a federal court will not give it preclusive effect either." *Meindl*, 204 F.3d at 128. However, "[i]f state law would afford the judgment preclusive effect . . . then a federal court must engage in a second step — it must determine if Congress created an exception to § 1738." *Id.* (citation omitted). Only if federal law provides an exception to § 1738 can a federal court refuse to give a state court judgment the same preclusive effect given it under the law of that state. *Id.*

## A.

We therefore must first determine whether, under Florida preclusion law, the Florida court's judgment refusing to recognize Ruth Jaffe's Canadian default judgment bars her claim for recognition of that judgment in the present suit. Florida law provides that "several conditions must occur simultaneously if a matter is to be made res judicata: [1] identity of the thing sued for; [2] identity of the cause of action; [3] identity of parties; [4] identity of the quality in the person for or against whom the claim is made." *Albrecht v. State*, 444 So.2d 8, 12 (Fla. 1984), *superseded by statute on other grounds*, *as stated in Bowen v. Florida Dep't of Envtl. Reg.*, 448 So.2d 566 (Fla. Dist. Ct. App. 1984). Finally, under Florida law, the prior cause of action must have been resolved by a final "adjudication on the merits." *Ludovici v. McKiness*, 545 So.2d 335, 337 (Fla. Dist. Ct. App. 1989) (citations omitted).

Ruth Jaffe does not (and indeed cannot) maintain that the first four prongs of Florida's res judicata test have not been met. What Ruth Jaffe claims is that the Florida judgment would not be entitled to res judicata under Florida law because it is not "an adjudication on the

8

merits." *Id.* She asserts that the Florida public policy which provided the rationale for the Florida judgment — refusal to enforce a judgment based on Sidney Jaffe's criminal failure to appear in court — is inconsistent with Virginia public policy. For this reason, she argues, a federal court in Virginia, sitting in diversity, should hold that the Florida court's grant of summary judgment to Accredited was not "on the merits." Even assuming that Virginia public policy does not accord with Florida public policy (which is not at all clear, *see infra* part III), this contention is meritless.

Ruth Jaffe's reliance on this argument seems to arise from her confusion as to what is at issue in her case. With respect to her claim, we must determine the enforceability of the prior Florida judgment refusing to enforce her Canadian default judgment, not the enforceability of the Canadian default judgment itself. Neither the full faith and credit statute, nor the Full Faith and Credit Clause of the Constitution, applies to judgments issued from foreign countries. *See Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (citations omitted); *Guinness*, 955 F.2d at 883. Accordingly, while both federal and state courts in the United States must give "full faith and credit" to any judgment of a state court empowered to enter the judgment, *see Baker v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998), they need only recognize the judgment of a foreign court to the extent that this recognition comports with principles of judicial comity. *See Hilton v. Guyot*, 159 U.S. 113, 203 (1895).

For this reason, a state can refuse, as Florida did, to recognize a *foreign* judgment on the ground that it conflicts with the public policy of that state. *Id.* at 163; *Herron v. Passailaigue*, 110 So. 539, 542 (Fla. 1926) (stating that a state court could refuse to enforce judgment from foreign country if contrary to "some paramount rule of public policy"); *see also* Uniform Foreign Money-Judgments Recognition Act of 1962 § 1 et seq., 13 U.L.A. 268 (1986) (providing that a foreign country money judgment "need not be recognized" if, among other reasons, the claim for relief "on which the judgment is based is repugnant to the public policy of this state").

But neither a state nor a federal court can refuse to give full faith and credit to the judgment of a state court because of disagreement with the public policy basis for that decision. Indeed, the Supreme

9

Court recently addressed this precise question and reiterated that its "decisions support no roving `public policy exception' to the full faith and credit due [state court] judgments." *Baker*, 522 U.S. at 233 (original emphasis omitted); *see also Estin v. Estin*, 334 U.S. 541 (1948); *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430 (1943); *Fauntleroy v. Lum*, 210 U.S. 230 (1908). Thus, even if Florida public policy on this issue is contrary to Virginia public policy, this provides no basis for a state or federal court in Virginia to refuse to give a Florida judgment based on its public policy full faith and credit.

Ruth Jaffe simply ignores this precedent and argues that because the Florida judgment is based on Florida public policy, it, like some Rule 41(b) dismissals on limitations grounds, *see Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 501-506 (2001), is not a judgment "on the merits" for res judicata purposes. Even if the line of Supreme Court cases from *Fauntleroy* to *Baker* did not apparently foreclose this argument, we would have to reject it. This is so because under Florida law, even an involuntary dismissal on limitations or other grounds, except for "a dismissal for lack of jurisdiction or for improper venue or for lack of an indispensable party," Fla. R. Civ. P. 1.420(b), does constitute an adjudication "on the merits" for res judicata purposes. *See* 33 Fla. Jur. 2d Judgments and Decrees § 190 (1994) ("Under the civil procedure rule governing involuntary dismissals . . . a final judgment of dismissal . . . is a final adjudication on the merits, and will bar a subsequent suit on the same cause of action between the same parties unless it affirmatively appears from the order of dismissal that it was made without prejudice." (citations omitted)); *see also, e.g., Allie v. Ionata*, 503 So.2d 1237, 1242 (Fla. 1987) (holding that dismissal on limitations grounds is a "dismissal . . . on the merits" under Fla. R. Civ. P. 1.420(b) and constitutes an "adjudication[] on the merits for res judicata purposes").

Accordingly, we must conclude that Florida law would afford the Florida court's grant of summary judgment to Accredited preclusive effect in any subsequent identical action, like the one at hand, brought by Ruth Jaffe.

### B.

We now proceed to the second step of our inquiry in resolving whether the full faith and credit statute, 28 U.S.C.A. § 1738, applies

10

here — examination of whether Congress has created a statutory exception to § 1738 that permits relitigation of Ruth Jaffe's claim. A court will recognize an exception to § 1738 only if "a later [federal] statute contains an express or implied partial repeal" of § 1738; an implied repeal requires an "irreconcilable conflict" between the two federal statutes. *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 468 (1982). The Supreme Court has noted that it has "seldom, if ever, held that a federal statute impliedly repealed § 1738 . . . due to the relatively stringent standard" for such findings. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 380-81 (1996).

Ruth Jaffe has identified no statute that explicitly or implicitly repeals § 1738 and so "the second step of our analysis can be easily resolved." *See Meindl v. Genesys Pac. Techs., Inc.* (*In re Genesys*), 245 F.3d 312, 314 (4th Cir. 2001) (citations omitted). We can only conclude that Congress has not repealed § 1738 to create some exception in this case; rather, the full faith and credit statute must be honored here. Hence, the district court properly held that the prior Florida judgment, refusing to recognize Ruth Jaffe's Canadian default judgment, must be given full faith and credit.

### III.

Sidney Jaffe's claim seeking enforcement of *his* Canadian default judgment presents a more difficult question. Sidney Jaffe too seeks recognition and enforcement of his Canadian default judgment pursuant to Virginia's Foreign Country Money-Judgments Recognition Act (the "Act"), Va. Code Ann. § 8.01-465.6 et seq. (Michie 2000). The Act, which parallels in relevant part the Uniform Foreign Money-Judgments Recognition Act, provides that a "foreign country money judgment is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit." *Id.* § 8.01-465.9.[5]

_____

[5] Jaffe's Canadian default judgment against Accredited seems at present to be enforceable in Canada notwithstanding the doubts expressed by the Canadian court in resolving the Jaffes' claims against the other defendants. *See supra* at 6-7. We note that the Act requires that a judgment be "final and conclusive and enforceable where rendered," even though "an appeal therefrom is pending or [the judgment] is subject to appeal." Va. Code Ann. § 8.01-465.8.

11

As a condition to enforcement, however, a court must first establish that the foreign country money judgment should be recognized. *See Guinness PLC v. Ward*, 955 F.2d at 891 (interpreting Maryland's version of the Uniform Recognition of Foreign Money-Judgments Act); *Matusevitch v. Telnikoff*, 877 F. Supp. 1, 2-3 (D.D.C. 1995), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) (stating that pursuant to the Uniform Foreign-Money Judgments Recognition Act, "[b]efore a party can enforce a judgment from a foreign country in the United States, the moving party must have the foreign judgment recognized by the state in which he is seeking to enforce the judgment"). A judgment that need not be recognized is not entitled to enforcement.

In relevant part, the Act provides that a "foreign country money judgment need not be recognized if . . . [t]he claim for relief on which the judgment is based is repugnant to the public policy of this Commonwealth." Va. Code Ann. § 8.01-465.10(B)(3). We have found no cases from Virginia courts applying the Act's public policy exception. We nonetheless look to Virginia case law to determine if we can discern whether a Virginia court would hold that the basis for Jaffe's Canadian judgment is repugnant to an important public policy manifested in Virginia law.

Accredited principally contends[6] that, as the district court held, recognition of Sidney Jaffe's Canadian default judgment "would be repugnant to Virginia public policy" for two interrelated reasons. To recognize Sidney Jaffe's default judgment would, Accredited main-

_____

[6] Accredited also briefly argues that the Florida judgment denying Ruth Jaffe's claim for recognition of her Canadian default judgment constitutes "res judicata" barring Sidney Jaffe's claim for recognition of his default judgment. This argument fails. Although under Florida law a judgment against an injured party bars any future derivative claims by a spouse, *see, e.g.*, *Gates v. Foley*, 247 So.2d 40, 45 (Fla. 1971), no Florida case supports the application of res judicata when the parties bring their claims in reverse order, as they did here. We cannot extend Florida law to preclude claims by an assertedly injured party (Sidney) after his spouse (Ruth) has lost on her derivative claim because a claim by an injured party and a derivative claim are not identical claims. Rather, a derivative claim may fail while the principal claim succeeds. *See, e.g.*, *Resmondo v. Int'l Builders of Fla., Inc.*, 265 So.2d 72, 73-74 (Fla. Dist. Ct. App. 1972).

12

tains, be contrary to Virginia public policy because it would (1) permit a wrongdoer to benefit from his own wrongs and (2) allow a fugitive from justice to call upon the resources of the courts while simultaneously evading their process.

### A.

The Supreme Court of Virginia has consistently refused to allow a party "to profit from its own wrongdoing." *Chosar Corp. v. Owens*, 370 S.E.2d 305, 308 (Va. 1988); *see Edwards v. Lowry*, 348 S.E.2d 259, 261 (Va. 1986) (refusing to reduce a father's child support obligation where his changed circumstance — termination from his job — was "the consequenc[e] of his own wrongdoing"); *McNeir v. McNeir*, 16 S.E.2d 632, 633 (Va. 1941) (refusing to award ex-wife support payments when she admitted to fraudulently obtaining a divorce because it would "offend[] a principle of law, that one cannot profit by one's own wrong"); *Eagle, Star & British Dominions Ins. Co. v. Heller*, 140 S.E. 314, 321 (Va. 1927) (refusing to allow arsonist to recover under fire insurance policy for goods he intentionally burned).

"When [this principle is] applied to actions in tort . . . consent or participation in an immoral or unlawful act by plaintiff precludes recovery for injuries sustained as a result of that act." *Miller v. Bennett*, 56 S.E.2d 217, 219 (Va. 1949); *see also Zysk v. Zysk*, 404 S.E.2d 721, 722 (Va. 1990) (stating that in a tort action, "consent, freely given without fraud or duress, bars recovery, even though the conduct constitutes a crime" because "courts will not assist the participant in an illegal act who seeks to profit from the act's commission"); *Trace Mountain Prods., Inc. v. Special Data, Inc.*, 1994 WL 1031414 at *3 (Va. Cir. Ct. Nov. 3, 1994) (ruling that corporate directors who fail to keep "accurate records" cannot "profit from uncertainty created by their own wrongdoing").

Applying this rule, the Supreme Court of Virginia has denied relief when "[t]he very illegal act to which the plaintiff consented and in which she participated produced the injuries and damages of which she complains." *Zysk*, 404 S.E.2d at 722 (holding that a wife could not recover against her husband for disease contracted from him prior to marriage because she participated in and consented to unlawful

13

premarital intercourse); *see also Miller*, 56 S.E.2d at 219 (ruling that a husband, as administrator of deceased wife's estate, could not maintain a wrongful death action based on an attempted abortion because his wife had participated in and consented to the unlawful abortion).

On the other hand, Virginia's highest court has held that this principle does not bar recovery if the plaintiff's unlawful act is not the *direct* cause of his injuries. *Godbolt v. Brawley*, 463 S.E.2d 657, 659-60 (Va. 1995); *cf. Matthews v. Warner*, 70 Va. 570 (Va. 1877) (stating that trial court was not required to instruct jury that if it found "that the death of the deceased . . . was the result of his own misconduct or neglect, then the jury must find for the defendant"). For example, *Godbolt* held that the plaintiff could maintain a civil action for assault against a security guard who shot him during a bar brawl, despite the plaintiff's participation in the brawl, because although the plaintiff "may have intentionally engaged in assaultive behavior, he did not engage in the use of deadly force and did not consent to its use." *Godbolt*, 463 S.E.2d at 660.

We cannot determine from these precedents whether the Virginia courts would permit Jaffe to recover against Accredited for "wrongful abduction" when Jaffe's own illegal act — jumping bail — led to Accredited's actions in apprehending him. Under Virginia law, Jaffe's instigating act of jumping bail constitutes a felony, *see* Va. Code Ann. § 19.2-128 (Michie 2000), and, therefore, an illegal and wrongful act.[7] Furthermore, like the plaintiffs in *Zysk* and *Miller*, Jaffe expressly manifested his consent to the very conduct undertaken by the defen-

_____

[7] Jaffe contends that the district court should have applied judicial estoppel to bar Accredited from asserting that he jumped bail because Accredited, relying on a statement by Jaffe's own counsel, had represented to the Florida court that Jaffe's failure to appear in court was due to a basketball injury. The hypocrisy of this argument is breathtaking. In essence, Jaffe seeks to punish Accredited for innocently repeating Jaffe's own lie. Judicial estoppel does not apply when a party's assertedly inconsistent positions stem from reliance on statements made to the court by an opponent, which later prove untrue. *See, e.g., Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996) (stating that party taking an inconsistent position must have "intentionally misled" the court (citation omitted)). Thus, the district court did not abuse its discretion in refusing to invoke the doctrine of judicial estoppel against Accredited.

14

dants that caused injury. Jaffe did this by consenting, in the bond agreement, to Accredited's right to "apprehend, arrest and surrender" him if he left Florida without Accredited's permission or moved from his residence without notifying Accredited.[8] Nonetheless, a Virginia court might conclude that Jaffe's act of jumping bail and fleeing to Canada was not a sufficiently direct cause of his alleged injuries, as required by the *Godbolt* rule, to apply the principle that a party cannot profit from his own wrongdoing.

B.

Similarly, we cannot determine whether Virginia courts would preclude Jaffe's underlying claim as contrary to public policy based on the fugitive from justice doctrine. Pursuant to that doctrine, also known as the fugitive disentitlement doctrine, a court may "dismiss an appeal or writ of certiorari if the party seeking relief is a fugitive while the matter is pending." *Degen v. United States*, 517 U.S. 820, 824 (1996); *see also Ortega-Rodriguez v. United States*, 507 U.S. 234, 242 (1993) (stating that the Supreme Court has upheld the doctrine "consistently and unequivocally"). A court has discretion in determining whether to apply the doctrine, which is equitable rather than jurisdictional in nature. *See Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970).

Federal courts have adopted the doctrine, *see, e.g., Goya Foods, Inc. v. Unanue-Casal*, 275 F.3d 124, 129 (1st Cir. 2001); *Prevot v. Prevot* (*In re Prevot*), 59 F.3d 556, 562 (6th Cir. 1995), as have some state courts. *See, e.g., In re J.J.*, 656 A.2d 1355, 1356 (Pa. 1995).

_____

[8] That a Canadian court convicted the Accredited bondsmen of criminal kidnapping leads to no contrary conclusion. A wrongdoer who participates or consents to the wrongdoing is not entitled to recover against an alleged tortfeasor even if the alleged tortfeasor could be subject to criminal prosecution for the same act. As the Supreme Court of Virginia has explained, "when the consenting participant seeks monetary reward for harm resulting from the unlawful conduct, the public interest [invaded by the crime] is protected sufficiently by criminal sanctions and does not require that the participant receive compensation." *Zysk*, 404 S.E.2d at 722 (citing *Miller*, 56 S.E.2d at 219-21; Restatement (Second) of Torts § 892C(1) cmt. b (1979)).

15

Other states have established the doctrine "by statute or rule." *See State v. Bell*, 608 N.W.2d 232, 234 (N.D. 2000) (citing authorities); *see also, e.g., Estelle v. Dorrough*, 420 U.S. 534 (1975).

No Virginia statute or rule codifies the doctrine, and we have found no decisions in which a Virginia court has adopted it. Nevertheless, the considerations justifying the doctrine reflect substantial public policy interests Virginia likely shares with other jurisdictions that have applied the doctrine. These include (1) a party's fugitive status can render a judgment "impossible to enforce"; (2) the inequity of allowing a fugitive to "call upon the resources of the Court for determination of his claims," and (3) the need to "discourage[ ] the felony of escape and encourage[ ] voluntary surrenders." *Degen*, 517 U.S. at 824 (internal quotation marks and citations omitted).

Relying on these justifications, both federal and state courts have applied the fugitive from justice doctrine not only in criminal cases but in "a variety of civil cases and proceedings." *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280-82 (2d Cir. 1997).[9] Indeed, the Florida appellate court cited the doctrine as one of the grounds for affirming the dismissal of Ruth Jaffe's claim, explaining that "[t]he fugitive from justice doctrine bars any claim or defense that is solely derivative of the fugitive's claim." *Jaffe v. Snow*, 610 So.2d at 486, 488 (stating also that Florida courts had adopted the doctrine because a fugitive's "duplicitous approach" in "wield[ing] a sword against our judicial system by escaping criminal prosecution" while "shield[ing] himself with the protection of his rights in the civil

_____

[9] In fact, some courts have stated that the doctrine should apply "with greater force in civil cases where an individual's liberty is not at stake." *Conforte v. C.I.R.*, 692 F.2d 587, 589 (9th Cir. 1982) (citations omitted). At least one court also has expanded the notion of "fugitive status" to one "who becomes a fugitive to escape the effect of [a] civil judgment." *Finkelstein*, 111 F.3d at 282. We are dealing here with a mixed criminal-civil case in which a fugitive from criminal charges is seeking a civil remedy. *See also Sarlund v. Anderson*, 205 F.3d 973, 974-76 (7th Cir. 2000) (dismissing civil rights suit "on the basis of the fugitive-disentitlement doctrine" because the plaintiff was "a fugitive from justice with two arrest warrants outstanding against him, one for disorderly conduct and the other for violating the terms of his probation").

16

courts" was "repugnant to our inherent sense of equity" (internal quotation marks and citation omitted)).

Although the fugitive from justice doctrine dates back more than one hundred years, the Supreme Court recently limited its application in the federal courts. In 1993, the *Ortega-Rodriguez* Court rejected the Eleventh Circuit's automatic rule mandating dismissal of fugitives' appeals and held that "some connection between a defendant's fugitive status and his appeal" must exist for the doctrine to apply. *Ortega-Rodriguez*, 507 U.S. at 249. Then, in 1996, *Degen* expanded on the nexus requirement and held that a federal court could not rely on the fugitive from justice doctrine to dismiss a civil forfeiture action merely "because [the party] is a fugitive from, or otherwise is resisting, a related criminal prosecution." *Degen*, 517 U.S. at 823. In reaching this conclusion, the Court held that fugitive status alone does not suffice to invoke the doctrine because disentitlement "is too blunt an instrument" for advancing the need to deter flight from prosecution by criminal defendants. *Degen*, 517 U.S. at 828.

Since *Degen*, both federal and state courts have continued to apply the doctrine in a civil setting. *See, e.g.*, *Goya Foods*, 275 F.3d at 128-29; *Pesin v. Rodriguez*, 244 F.3d 1250, 1252-53 (11th Cir. 2001); *Matsumoto v. Matsumoto*, 792 A.2d 1222, 1232-33 (N.J. 2002); *Guerin v. Guerin*, 993 P.2d 1256, 1258 (Nev. 2000). Federal courts after *Degen*, however, have required a substantial nexus between a litigant's fugitive status and the issue before the court. *See, e.g.*, *Barnett v. YMCA*, 268 F.3d 614 (8th Cir. 2001) (holding insufficient nexus between a claim that a work release program violated federal minimum wage laws and the prisoner's departure from a half-way house where he was paroled); *Daccarett-Ghia v. C.I.R.*, 70 F.3d 621, 629 (D.C. Cir. 1995) (holding that "mere commonality of subject matter" did not establish a sufficient nexus between a Tax Court proceeding and a party's fugitive status based on "his failure to appear in a criminal case pending in another jurisdiction"). Although some state courts have also followed *Degen* and *Ortega-Rodriquez* to require a close nexus, *see, e.g.*, *Matsumoto*, 792 A.2d at 1233; *State v. Lundahl*, 882 P.2d 644, 646-47 (Ore. Ct. App. 1994), not all state courts have regarded the Supreme Court cases as affecting the relevant state law. *See, e.g.*, *Scelba v. Scelba*, 535 S.E.2d 668, 672 (S.C. Ct. App. 2000)

17

(relying on pre-*Degen* and *Ortega-Rodriquez* state cases to determine the contours of the fugitive disentitlement doctrine).

Jaffe maintains that even if Virginia follows the fugitive from justice doctrine, Virginia courts could not apply the doctrine in this case because, *inter alia*, an insufficient nexus exists to invoke the doctrine. Jaffe's status as a fugitive stems from charges that he committed criminal fraud through answers to interrogatories in two civil lawsuits, while his current enforcement action relates to the allegedly illegal acts of the bondsmen who kidnapped him in Canada after he jumped bond in an attempt to avoid criminal prosecution on charges that were related to, but preceded, the criminal fraud charges. In the absence of any Virginia statute, rule, or case stating or discussing the fugitive from justice doctrine, we cannot determine if a Virginia court would adopt the doctrine and, if so, whether a Virginia court would hold that under Virginia law the doctrine would apply to bar a claim like that which forms the basis of Jaffe's default judgment.

### C.

Finally, even if we could conclude that Virginia law would not permit the claim for relief on which Jaffe's Canadian default judgment was based, under either the principle that a party cannot profit from his own wrongdoing or the fugitive from justice doctrine, we cannot determine whether a Virginia court would conclude that the conflict between Virginia public policy and the Canadian default judgment rises to a level that warrants non-recognition of the default judgment. *See, e.g.*, *Ackermann v. Levine*, 788 F.2d 830, 842-43 (2d Cir. 1986) (explaining that under the common law "it is not enough merely that a foreign judgment fails to fulfill domestic practice or policy" and agreeing that it must "offend [a] sense of justice and menace the public welfare" (citation omitted)); *McCord v. Jet Spray Int'l Corp.*, 874 F. Supp. 436, 439 (D. Mass. 1994) (applying a similar standard in interpreting the Massachusetts version of the Uniform Foreign-Money Judgments Recognition Act).

### D.

Given these several uncertainties, we will not substitute our judgment for the judgment of the Supreme Court of Virginia and, there-

18

fore, respectfully certify to that court, pursuant to its discretionary authority under Rule 5:42 of the Rules of the Supreme Court of Virginia, the following question:

> Is the claim for relief that forms the basis for the Canadian default judgment in favor of Sidney Jaffe and against Accredited repugnant to the public policy of Virginia, such that the judgment need not be recognized pursuant to the Foreign Country Money-Judgments Recognition Act, Va. Code Ann. § 8.01-465.6 et seq.?

*See* Va. S. Ct. R. 5:42(a).

In certifying this question, we note that although our discussion of the possible grounds for non-recognition of Jaffe's Canadian default judgment has focused on the principle that one cannot profit from his own wrongdoing and on the fugitive from justice doctrine, we do not intend to foreclose the Supreme Court of Virginia from considering any other grounds for non-recognition that it believes the facts of this case present.

Should the Supreme Court of Virginia accept certification on the above question and answer in the affirmative, Jaffe's Canadian default judgment need not be recognized and, consequently, Jaffe is not entitled to enforce it. In the event the Supreme Court of Virginia court answers in the negative, we cannot refuse recognition of Jaffe's judgment based on the public policy exception of Va. Code Ann. § 8.01-465.10(B)(3).

## IV.

For the above reasons, we hold that the full faith and credit statute bars Ruth Jaffe's claim for recognition of her Canadian default judgment. We therefore affirm summary judgment in favor of Accredited on Ruth Jaffe's claim. However, we certify to the Supreme Court of Virginia the question of whether the basis for Sidney Jaffe's Canadian default judgment is repugnant to Virginia public policy, rendering it unenforceable under § 8.01-465.10(B)(3). The accompanying certification order shall first be released to counsel, who shall have 15 days

19

to submit suggested changes to the Statement of Facts. We reserve the right to modify this opinion in light of the comments received. The judgment of the district court granting summary judgment to Accredited therefore is

*AFFIRMED IN PART AND CERTIFIED IN*

*PART TO THE SUPREME COURT OF VIRGINIA.*

20