OPINION OF THE COURT
W. Dennis Duggan, J.
In this case, the court holds that the “fugitive disentitlement doctrine” prohibits the respondent (mother) from filing a petition by order to show cause seeking affirmative relief in the pending action.[1] This appears to be a case of first impression in *152 New York in a civil case and the first case of any type in New York in which this doctrine’s full parameters have been specifically examined. While New York appellate courts have frequently dismissed criminal appeals when the defendant has jumped bail, the legal principles to be applied in those types of cases, under varying factual circumstances, have not been fully examined by the New York cases. Additionally, New York has not specifically adopted the “fugitive disentitlement doctrine” rubric that is used by the federal courts.* [2] For this reason, perhaps, the common-law foundations upon which this state’s decisions rest remain underexposed. Additionally, there appear to be no examples in New York of the doctrine being applied in a civil law context — certainly not in the family law area.[3]
The underlying actions in this case are paternity and custody proceedings filed by the putative father in November 2001. It took over two months to obtain the mother’s initial appearance at which time the case was adjourned to allow the mother to retain counsel. The case was then adjourned twice more to allow the mother more time to retain counsel. In the meantime, *153 the court ordered DNA tests. Next, the DNA test was adjourned at the request of the mother because she claimed the child was out of the state with an aunt. Finally, nearly three months after her initial appearance, the mother appeared for the DNA test. However, she signed the testing consent form “under protest” and the laboratory declined to draw the sample.
Five months after the filing date, the court, with no other practical alternative available (other than jailing the mother until the child was produced and the DNA test was completed and hindsight has obviously increased the practicality of this alternative), conducted a hearing without any DNA evidence. The father presented his evidence and the mother rested her case after calling two witnesses, with the representation that she would finally cooperate with a DNA test. Five weeks later, on the date scheduled for the test, the mother appeared late for her appointment and the lab technician, by that time, had left the court. At the mother’s request and for her convenience, a DNA test was then scheduled near her claimed new residence in New Jersey. The mother failed to appear for that test and the court issued a warrant for her arrest. Nine months had now passed from the date of the filing of the petition. On September 30, 2002, the mother again failed to appear in court, though her counsel did. The court entered an order of filiation based on the clear and convincing evidence produced by the father at the earlier hearing date. The father was also granted temporary custody in a temporary order of protection. This would allow the father to obtain physical custody of the child and allow the court to proceed with his custody petition. The court also held out the possibility of opening up the proof for DNA test results if the mother’s cooperation could ever be obtained.
With a full year now having passed, the mother, by new counsel, has filed an order to show cause seeking to vacate the arrest warrant, the order of filiation, the temporary order of protection and to reschedule DNA tests. The mother states that she will not appear in court or produce the child unless the court grants the relief requested in her order to show cause. In her moving papers, she claims for the first time that the petitioner raped her. She also claims that the child’s real father signed an acknowledgment of paternity and is involved in the child’s life. However, she does not identify the “real father” nor does she produce the acknowledgment of paternity. No father is listed on the birth certificate nor on the putative father registry. Another new claim, made by her attorney at oral argu *154 ment, is that the child named in the petition is really her aunt’s child, born two weeks after the mother’s baby was born. Her new defense for not complying with the DNA testing orders was that she was confused over which baby to bring to the test. However, it is not disputed that the date of birth of the child named in the petition is the mother’s child’s. This new mistaken baby defense comes over one year into the case and after the child’s birth certificate was placed into evidence at a hearing where the mother and her attorney were present. No mention was ever made of a misnamed baby at that time, even though it was clearly noted in court that the name of the child on the birth certificate and the name on the petition were different. At the court appearance on January 7, 2002, the mother stated on the record that the child’s name was, in effect, both the name on the petition, Aliyah, and the name on the birth certificate, Antionette (sic). The Law Guardian stated on the record that the mother always referred to the child by the name first listed in the putative father’s petition, i.e., Aliyah. For the reasons set forth below, the court declines to issue this order to show cause.[4]
*155 The fugitive disentitlement doctrine is essentially the legal equivalent of the aphorism that “you can’t have your cake and eat it too."[5] As a relative to the “clean hands doctrine,” the fugitive disentitlement doctrine holds that a person is not entitled to seek the court’s assistance in the same cause from which he or she is a fugitive. It has been explained that the authority for the doctrine abides in a court’s need to protect the fairness of its litigation process, the integrity of its judgments and orders and to remedy affronts to the respect due the judicial branch. This power has also been found to be inherent in a court’s right to manage its proceedings in an efficient and equitable manner. However, a court must be very cautious in self-defining its own authority by declaring that some power is inherent.
“Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities. The extent of these powers must be delimited with care, for there is a danger of overreaching when one branch of Government, without benefit of cooperation or correction from the others, undertakes to define its own authority. In many instances the inherent powers of the courts may be controlled or overridden by statute or rule. Principles of deference counsel restraint in resorting to inherent power and require its use to be a reasonable response to the problems and needs that provoke it.” (Degen v United States, 517 US 820, 823-824 [1996] [internal citations omitted].)
The fugitive disentitlement doctrine arises primarily in three situations. First, making up the biggest share of the cases, is where a convicted defendant becomes a fugitive and, as a consequence, his appeal from the conviction is dismissed. The Court of Appeals first established this as the common law of New York in 1874 in People v Genet (59 NY 80). The Supreme Court of the United States, citing Genet, followed suit two years later in Smith v United States (94 US 97 [1876]). New York’s *156 appellate cases all fall into this category. The second and third categories arise primarily (but not necessarily) under federal law. The second category involves cases under the International Child Abduction Remedies Act (ICARA; 42 USC § 11601) which implements the protocols of the Hague Convention on the Civil Aspects of Child Abduction. In these cases, civil appeals have been dismissed where a parent has refused to return the child to the country of origin. Pesin v Rodriguez (244 F3d 1250 [11th Cir 2001]) provides a good example of this type of proceeding and is very close to this case.
Pesin sought the return of his two children to Venezuela from the United States, where they were being held by the mother. The Federal District Court issued a warrant for the mother’s arrest when she failed to appear in court and return the children to Venezuela. Despite her failure to comply with the court’s directions, the mother appealed the court’s order. In dismissing the mother’s appeal, the Circuit Court of Appeals held:
“[The mother] has repeatedly defied court orders and ignored contempt sanctions and has continued to evade arrest. Her behavior to date leaves little doubt that she would defy an adverse ruling. Moreover, it would be inequitable to allow [the mother] to use the resources of the courts only if the outcome is a benefit to her. We cannot permit [the mother] to reap the benefits of a judicial system the orders of which she has continued to flaunt.” (Pesin at 1253; see also Walsh v Walsh, 221 F3d 204 [1st Cir 2000].)
The third large group of fugitive disentitlement cases involves situations where a person has been indicted or convicted of money laundering in connection with a drug enterprise and the Internal Revenue Service (IRS) has filed a jeopardy assessment levy on the proceeds of the enterprise. Daccarett-Ghia v Commissioner of Internal Revenue Serv. (70 F3d 621 [1995]) is a good example of this type of case.
Daccarett-Ghia was a resident of Colombia who was under indictment in Federal District Court in New Jersey for drug offenses. In a civil forfeiture proceeding the Government tried to seize the assets of one of Daccarett-Ghia’s corporations. This application was denied. Before the assets were released by the court, the IRS seized them by issuing a jeopardy assessment levy. Daccarett-Ghia challenged this levy. The Tax Court dismissed his challenge because he was a fugitive on the crim *157 inal indictment. The United States Court of Appeals for the District of Columbia reversed the Tax Court. In applying the Supreme Court’s decision in Ortega-Rodriguez v United States (507 US 234 [1993]) the Court held that: “If the individual’s fugitive status has no ‘connection’ to the present proceedings in the sense that it neither affects the court’s ability to carry out its judicial business nor prejudices the government as a litigant, the claim may not be dismissed.” (Daccarett-Ghia at 626, cert denied 525 US 1147 [1999].)
Until recently, the justifications for the fugitive disentitlement doctrine have often been couched in terms of protecting the integrity of the judicial process and redressing the judiciary from affronts to its entitled respect, along with general considerations of fairness. The Supreme Court, in the Ortega and Degen cases cited above, has taken a more practical approach to applying this doctrine which provides more predictable and satisfactory results. “[The Supreme Court] as we read it shifts the emphasis from considerations of dignity, deterrence, respect, propriety, and symmetry found in a number of earlier cases * * * to the kind of practical considerations that inform the decision whether to dismiss a suit with prejudice as a sanction for mistakes, omissions, or misconduct.” (Sarlund v Anderson, 205 F3d 973, 974 [7th Cir 2000].) Guided by those two decisions along with the Seventh Circuit’s opinion in Sar-lund, New York’s rule should be similar to that set forth by the Supreme Court of New Jersey in Matsumoto v Matsumoto (171 NJ 110, 792 A2d 1222 [2002]).
The Supreme Court took a thorough look at the fugitive dis-entitlement doctrine in Ortega-Rodriguez v United States (507 US 234 [1993]). Ortega fled the jurisdiction after conviction and he was sentenced in absentia. After being apprehended, he was resentenced and he appealed his conviction. The Circuit Court dismissed the appeal based on the fugitive disentitlement doctrine, even though the defendant was back in custody when the appeal was filed. The Supreme Court disagreed and reversed.
“Accordingly, the justifications we have advanced for allowing appellate courts to dismiss pending fugitive appeals all assume some connection between a defendant’s fugitive status and the appellate process, sufficient to make an appellate sanction a reasonable response. These justifications are necessarily attenuated when applied to a case in which both flight and recapture occur while the case is pending *158 before the district court, so that a defendant’s fugitive status at no time coincides with his appeal” 0Ortega at 244).[6]
Three years later, the Supreme Court in Degen v United States (517 US 820 [1996]) revisited the fugitive disentitlement doctrine. Degen, a Swiss citizen, was indicted in Federal District Court in Nevada for drug distribution and money laundering. In addition, a civil forfeiture proceeding was commenced against properties in the United States claimed to have been obtained with ill-gotten gains. Degen had been residing in Switzerland since 1988 and there was no extradition treaty obliging the Swiss to return him. The question presented was whether the fugitive disentitlement doctrine could be invoked to prohibit the defendant from answering in the civil forfeiture case. The Supreme Court again declined to invoke any per se dismissal rule. It held that where there existed alternative means to protect the Government’s interests, such as sanctions or the dismissal for the failure to comply with discovery demands, an automatic dismissal rule was not warranted.
“Without resolving whether Degen is a fugitive in all the senses of the word debated by the parties, we acknowledge disquiet at the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored. * * * A court-made rule striking Degen’s claims and entering summary judgment against him as a sanction, however, would be an arbitrary response to the conduct it is supposed to redress or discourage.” (Degen at 828.)
Ortega and Degen teach us that trying to measure the affront to a court’s dignity caused by a fugitive or using some other intangible standard will often lead to arbitrary results. A *159 court should look first to some connection between the fugitivity and the legal action sought to be taken by the fugitive. If the fugitive status of the defendant will somehow prejudice a fair determination of the litigation that cannot be rectified by some remedial order of the court, only then is an outright dismissal with prejudice warranted. This balancing test was instructively applied in Sarlund v Anderson (205 F3d 973 [7th Cir 2000]). In Sarlund, the court was asked to dismiss a plaintiffs 42 USC § 1983 civil rights lawsuit based on the fact that the plaintiff was a fugitive defendant in a criminal proceeding. Sarlund was a confidential informant in a police corruption case who was suing the police for a violation of his civil rights. He was claiming that his criminal charges were concocted by police to compromise him as an informer against them. Sarlund fled the jurisdiction because he claimed his life was in danger from the police defendants in the civil suit. The Circuit Court dismissed Sarlund’s civil lawsuit on the grounds that the civil defendants (the police) had no other adequate way to defend in the civil lawsuit if Sarlund was a fugitive and could not be deposed.[7]
In Matsumoto v Matsumoto (171 NJ 110, 792 A2d 1222 [2002]), the Supreme Court of New Jersey considered a complicated family law fact pattern and tied together the several threads running through the fugitive disentitlement doctrine cases. Matsumoto involved a Japanese father and grandmother who wrongfully kept the child in Japan and away from the mother in violation of civil and criminal mandates from the courts of the State of New Jersey. Much like this case, the defendants offered to consent to the personal jurisdiction of New Jersey and return from Japan with the child if the court vacated the arrest warrants and money sanctions and dismissed the indictments. The New Jersey Supreme Court dismissed the father’s and grandmother’s appeals, holding, as this court does, that it would not be held hostage to the appellants’ demands. To do so would actually grant fugitives a benefit and encourage other litigants to become fugitives.
*160 To apply the fugitive disentitlement doctrine, the following elements must be present:
1. The petitioner for judicial relief must be a fugitive from justice. It does not matter if he or she is a fugitive in a civil or criminal case.
2. There must be some connection between the petitioner’s fugitive status and the legal action which the fugitive wishes to pursue.[8]
3. The petitioner’s fugitive status must work some actual prejudice to the other party to the lawsuit.
4. To justify an outright dismissal, the remedies available to the court must be inadequate to ameliorate the prejudice. At this point, the court may also consider any prejudice to the court and the issue of deterrence. This could include the issue of specific deterrence of the party fugitive and general deterrence of potential fugitives. The court may also consider whether the use of remedies short of dismissal would adversely affect the general administration of justice and significantly diminish respect for the judicial process and if dismissal would advance those interests.
The mother, in this case, meets all three prongs of this test. There is a warrant for her arrest, which is known to her, making her a fugitive from justice. There is a direct connection between the mother’s fugitive status and the father’s custody petition because she is a fugitive in that very case. The mother is not only a fugitive from justice, she has also absconded with the child. Finally, the mother’s actions are in direct defiance of the court’s order of filiation and temporary order of custody, which directly prejudice the father.
Accordingly, based on the fugitive disentitlement doctrine, the court declines to sign the order to show cause and her petition will not be calendared for a court appearance.

. The results reached in this case would be the same if the mother’s request for relief reached the court by notice of motion and motion, notice of *152 petition and petition or by summons and petition. The fact that the court is declining to sign the mother’s order to show cause is not the legally significant determinative of this proceeding. The signing of an order to show cause is discretionary under CPLR 2214 (d) and can be reviewed by a justice of the Appellate Division under CPLR 5704. The court in this case is holding that, under the circumstances, the mother has no right to seek the relief requested because she is a fugitive from justice. It is irrelevant as to the form by which she made her request. However, it should be noted that Family Court Act § 651 requires that petitions for custody and visitation (and presumably petitions to modify existing orders that address those subjects) must be brought on by order to show cause or by writ of habeas corpus.

. A LEXIS and Westlaw New York case law search under all variations of the phrase “fugitive disentitlement doctrine” produces no hits.

. Nearly every New York appellate decision in this area cites to the only two cases that offer any discussion of the issue in question: People v Genet (59 NY 80 [1874]) and People v Del Rio (14 NY2d 165 [1964]). Both cases involved defendants who tried to pursue an appeal from a criminal conviction. In Genet, the defendant escaped from custody after the verdict but before sentencing. In Del Rio, the defendant had accepted a pardon, one condition of which was that he agreed never to return to the United States. Both cases held that a person who is not in actual or constructive custody may not have his conviction reviewed. The principle applied was quite simple. A court should not be expected to render judgment in a matter where there is no expectation that there will be compliance with the court’s mandate if it is averse to the fugitive appellant. The Appellate Division is similarly quite laconic in this area, issuing essentially one sentence opinions. For example, see the following: People v Barnes (143 AD2d 837); People v Southerland (136 AD2d 662); People v Flemming (104 AD2d 1048); People v Deutsch (23 AD2d 732). For a somewhat more expansive discussion, see People v Gilestrella (127 Misc 2d 356) and People v Flannigan (139 Misc 2d 461).

. At this point in the proceedings, it is difficult to credit any of the mother’s assertions without corroboration. Aside from raising issues of rape and the wrong baby, after the case has been pending for over a year, the mother has done or said several other things that seriously compromise her credibility. For example, though stating several times that she would take a DNA test, she effectively refused the first one by signing the form “under protest.” She then failed to show for two other appointments scheduled at her convenience. Then there is the appeal that was filed on her behalf by her mother as her “personal representative.” Her mother, who is not an attorney, was a witness for her daughter at the hearing. Then there is the issue of her residence. The mother initially stated that she lived in Albany. Then she gave the court a New Jersey address. Though she has claimed that this New Jersey address should have been kept confidential (it was listed on the father’s order of protection), the court papers sent to her at that address were returned by the United States Postal Service marked “Return to Sender-Attempted Not Known.” At one of the court proceedings the mother produced a lease purporting to be verification that she did live at the New Jersey, address. However, the father represented that when he went to that address, attempting to find his baby, he was told by the landlord that no one by that name lived there. However, the name on the mailbox did match that of the mother’s aunt, Michele Lewis, who is presumably the mother of the “mistaken baby.” An examination of the lease reveals that it is not signed by any landlord and no landlord’s name appears on the lease. Also, the place where the landlord’s name and the tenant’s name would be printed appears to have been blanked out and the name “Dimari B N Lewis” looks as if it was typed over a handwritten name. It also seems unusual that a New Jersey landlord would use a 1978, “National Legal Supply, Inc., 128 Sheridan Avenue, Albany, N.Y. 12210” lease agreement form. Finally, the father also *155 stated in court that he recently saw the mother’s car in front of the grandmother’s house in Albany. He called the police to the residence and, at some point during the events, he saw the mother flee from the rear of the building.

. This aphorism was first recorded in a book of proverbs by John Heywood in England in 1546 (Random House Dictionary of America’s Popular Proverbs [Titleman ed NY 2000]).

. Ortega was a 5 to 4 decision. Chief Justice Rehnquist, joined by Justices White, O’Connor and Thomas, wrote that among other reasons, the automatic dismissal rule of the Circuit Court was justified because it deterred flight and encouraged surrender. “To a defendant deciding whether to flee before or after filing a notice of appeal, today’s decision makes the choice simple. If the defendant flees preappeal and happens to get caught after the time for filing a notice of appeal has expired, he still has the opportunity for appellate review if he can persuade a district judge to resentence him” (Ortega at 256). Surprisingly, Degen, a seemingly more compelling case for application of an automatic dismissal rule was unanimous in the other direction, perhaps reflecting the power of stare decisis.

. The Supreme Court has not held that a court may not consider the need to redress the indignity visited upon a court by a defendant’s seeking to access the courts while he is a fugitive. In fact, in Degen, the Court held that such a consideration, along with that of deterrence, were substantial interests but that they should be sparingly applied. “It remains the case, however, that the sanction of disentitlement is most severe and so could disserve the dignitary purposes for which it is invoked. The dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits” (Degen at 828).

. One can think of some circumstances that would justify invoking the fugitive disentitlement doctrine even though no nexus or prejudice existed. There could be a situation where allowing a person access to our courts would be a gross travesty of justice or would shock the conscience. For example, say the mother of one of Osama bin Laden’s children brought the child to the United States. Would our Federal District Court entertain an action brought by Osama bin Laden to enforce the Hague Convention on the Civil Aspects of Child Abduction?