947 So.2d 1009 (2006)
Maurice WEAVER, Appellant
v.
Debra PARKS, Appellee.
No. 2005-CA-00932-COA.
Court of Appeals of Mississippi.
December 12, 2006.
*1010 Lisa Mishune Ross, attorney for appellant.
Louis Joseph Guichet, Brandon, attorney for appellee.
Before MYERS, P.J., BARNES and ISHEE, JJ.
BARNES, J., for the Court.
¶ 1. Maurice Weaver was found to be in constructive criminal contempt of court for absconding with his minor child, Madison Chloe Weaver, in violation of an agreed order and for his refusal to return and submit to the jurisdiction of the Chancery Court of Hinds County. Unaware of her client's whereabouts, Weaver's counsel perfected his appeal, asserting error as follows: (1) the chancellor improperly refused to recuse himself from the criminal contempt hearing, (2) the chancellor failed to make factual findings with respect to the Albright factors when he awarded temporary custody of Chloe to Debra Parks, Chloe's maternal grandmother, and, (3) Weaver's rights to due process were violated when the chancellor held an ex parte hearing of Parks's habeas corpus petition without summons or proof of service. Finding the fugitive dismissal rule applicable to this case, we dismiss Weaver's appeal sua sponte.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Madison Chloe Weaver[1] was born on October 17, 2003. At the time of Chloe's birth, her mother, Chastity Cook, and Maurice Weaver were not married nor had the couple taken any other steps to legally establish Weaver's paternity.[2] Approximately three and one-half months later, *1011 on or about February 1, 2004, Chastity Cook passed away. Subsequent to Chastity's death, Chloe lived with Maurice Weaver and his mother until March 15, 2004. On this date, Debra Parks, Chastity's motherand Chloe's maternal grandmothertook custody of Chloe. Chloe was residing with Parks when the complaint which began the instant action was filed.
¶ 3. On March 29, 2004, Weaver filed a "Complaint for Custody and Paternity" in Hinds County Chancery Court. In this complaint, Weaver sought custody of Chloe and also sought an adjudication of his paternity of Chloe. To this end, Weaver asserted his willingness "to submit to an order requiring the parties to submit to a blood or other genetic test to determine paternity. . . ." A DNA test was performed in May, 2004, establishing the probability of Weaver's paternity of Chloe to be 99.81%. An agreed order was entered on May 27, 2004, "allowing Maurice Weaver, the natural father of Madison Chloe Weaver, visitation rights . . . from 5:00 p[.]m. Friday, May 28, 2004 until 6:00 p.m. Monday, May 31, 2004." Pursuant to this order, Chloe was to be picked up from and returned to the home of Debra Parks. A second agreed order was entered on June 14, 2004. This agreed order granted regular weekend visitation to Weaver "from 5:00 p.m. Friday, on every first, third, and fifth weekend of a month until 6:00 p.m. Sunday." Additionally, this order provided for visitation on Wednesdays from 6:00 p.m. to 8:00 p.m. According to the agreed order, at the conclusion of weekend visitation, "Madison Chloe Cook shall be dropped off at the residence of Debra Parks on Sunday at 6:00 p.m. by Maurice Weaver or a member of his family." The order further provided that at the end of each Wednesday visitation, "Madison Chloe Cook shall be picked up at Maurice Weaver's Mother's residence at 8:00 p.m. by Debra Parks or a member of her family."[3] The foregoing visitation schedule was made by agreement of the parties and order of the court "pending a hearing on Maurice Weaver's Petition for Custody."
¶ 4. On or about September 22, 2004, Cathy Weaver Terrell, Weaver's mother, came to Parks's residence to pick Chloe up for Weaver's Wednesday visitation. According to Terrell's contempt hearing testimony, when she arrived at Parks's residence, she noticed several red marks on Chloe's body. The precise nature and severity of the red marks was not known at that time. According to Terrell, after arriving home with Chloe and conferring with Weaver regarding the marks, Weaver "called DHS, contacted his attorney." Terrell further testified that "DHS had suggested that we at least take the baby to the emergency room and find out what the marks were." Weaver and Terrell proceeded to take Chloe to the emergency room.
¶ 5. After some time had passed at the emergency room, Terrell called Parks and informed her that Terrell and Weaver, along with Chloe, were at the emergency room. By this time, the 8:00 p.m. deadline for Weaver's Wednesday visitation had passed. What happened when Parks arrived at the emergency room is somewhat contested. In any event, it is uncontested that Parks expressed her desire that Chloe not see the emergency room doctor that night. Parks's version is that it was late, almost 10:00 p.m., and that Parks insisted that she would take Chloe to see her pediatrician the following morning. Terrell testified that Parks basically "objected and [asked] who had given this authorization *1012 [for Chloe to be treated]." That same night, and while the parties were still at the emergency room, Weaver absconded with Chloe and has since refused to return Chloe to the custody of Parks or to submit to the jurisdiction of the Hinds County Chancery Court.
¶ 6. On September 28, 2004, Parks filed a "Petition for Emergency Hearing and Contempt Charges," citing Weaver's violation of the June 14, 2004 agreed order. On October 7, Parks filed a "Petition for Habeas Corpus and Other Emergency Relief." In this petition, Parks again cited Weaver's refusal to return Chloe from the Wednesday, September 22 visitation, in violation of the agreed order. Parks requested that physical custody of Chloe be "immediately returned to Debra Parks from Maurice Weaver," and that a habeas corpus order be entered directing authorities to assist in securing Parks's custody of Chloe. On the same day the petition was filed, the chancellor entered an "Order of Habeas Corpus and Other Emergency Relief and Writ of Assistance." This order acknowledged that Parks "has temporary custody of [Chloe] pending a hearing on Maurice Weaver's Petition for Custody and Debra Parks' Counterclaim for Custody."[4] This order further acknowledged that Weaver had failed to return Chloe following visitation as provided for in the "Agreed Order." Accordingly, the order directed "any . . . qualified officer or agency . . . to immediately take the body of Madison Chloe Cook from Maurice Weaver, or from his relatives, or from whatever location the minor child is presently located. . . ."
¶ 7. Parks filed another petition for contempt charges on December 14, 2004, citing her inability to locate either Weaver or Chloe and asserting Weaver's "intentional violation of not only The Order of Habeas Corpus, but also the Agreed Order entered into by this Court." Parks filed a third petition for contempt charges on January 18, 2005. Weaver responded to this petition, alleging, inter alia, that Parks was unfit to have custody of Chloe and asserting several specific occurrences to support this allegation. As to the contempt charges, Weaver stated that his "intentions were never to dishonor the court order" and that he "was very concerned of the unwillingness of Debra Parks to allow my daughter to be examined by the doctor" regarding alleged flea bites. Weaver proceeded to "ask forgiveness for behaving in a way disallowed by the court order dated June 14, 2004," stating that his "only concern is the health, safety, and welfare of [his] daughter, Madison Chloe."
¶ 8. On February 24, 2005, the chancery court entered a "Specification of Constructive Criminal Contempt Charge, Notice of Hearing Thereon and Order to Show Cause." A summons was issued and served by publication, noticing the show cause order and hearing to be conducted on April 14, 2005. Although Weaver still refused to return Chloe or to otherwise submit to the chancery court's jurisdiction, a hearing was conducted as noticed and a "Judgment Finding Defendant/Respondent in Constructive Criminal Contempt of Court" was entered on April 18, 2005.[5] *1013 Pursuant to this judgment, Weaver was sentenced to a term of twenty-four weeks in the custody of the Hinds County Sheriff and was fined five hundred dollars plus costs of the proceedings. It is from this judgment of constructive criminal contempt that Weaver's counsel perfected this appeal.[6]

DISCUSSION
¶ 9. "It is well settled that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal." Hires v. State, 882 So.2d 225, 228(¶ 6) (Miss.2004) (citing Ortega-Rodriguez v. United States, 507 U.S. 234, 239, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993)); see also Derrick v. State, 406 So.2d 48 (Miss.1981). The fugitive dismissal rule, or fugitive disentitlement doctrine, operates to limit a litigant's "access to the judicial system whose authority he evades." Bagwell v. Dretke, 376 F.3d 408, 410 (5th Cir.2004). Despite the rule's widespread acceptance, the fugitive dismissal rule is a "blunt" instrument that should only be applied after serious consideration. Degen v. United States, 517 U.S. 820, 828, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996).
¶ 10. Although Mississippi courts have not passed upon the rule's applicability to the precise situation with which we are presented, the principles that underlie its application in the context of criminal appeals are equally applicable to the case at bar. According to our supreme court, "[t]he rationale behind the rule is that `dismissal by an appellate court after a defendant has fled its jurisdiction serves an important deterrent function and advances an interest in efficient, dignified appellate practice.'" Hires, 882 So.2d at 228(¶ 6) (quoting Ortega-Rodriguez, 507 U.S. at 242, 113 S.Ct. 1199). Another widely cited rationale for the doctrine's application is the inequity of allowing a defendant, who has flouted the court's jurisdiction, to employ the resources of an appellate court when it is very likely that the defendant would ignore an adverse ruling. See, e.g., Ortega-Rodriguez, 507 U.S. at 240, 113 S.Ct. 1199 (stating that it is within court's discretion to refuse appeal unless convicted party is amenable to court's judgment); Bagwell v. Dretke, 376 F.3d 408, 410 (5th Cir.2004) (fugitive disentitlement doctrine limits party's access to "judicial system whose authority he evades"); Pesin v. Rodriguez, 244 F.3d 1250, 1253 (11th Cir.2001) (dismissing appeal of mother in hiding with her children where "her behavior to date leaves little doubt that she would defy an adverse ruling"); Matsumoto v. Matsumoto, 171 N.J. 110, 134, 792 A.2d 1222 (N.J.2002) (stating that dismissal proper where enforcement was improbable in the event of unfavorable decision to the fugitive parent). In addition to avoiding enforcement difficulties, serving a deterrent function, and promoting principles of efficiency and dignity, the *1014 doctrine is also employed to "avoid[] prejudice to the other side caused by the appellant's fugitive status." Pesin, 244 F.3d at 1253 (citing Empire Blue Cross and Blue Shield v. Finkelstein, 111 F.3d 278, 280 (2d Cir.1997)).
¶ 11. We find the rationale behind application of the fugitive dismissal rule to criminal appeals to be equally relevant to the facts of this case. Moreover, we find ample authority for its application where, as here, a parent absconds with his child in defiance of the court's jurisdiction. In Pesin, the United States Court of Appeals for the Eleventh Circuit noted that while "the `classic case' in which the doctrine has been applied involves the direct appeal of a criminal defendant, the doctrine has also been applied where the fugitive was not a criminal defendant, but instead was a civil litigant who continued to ignore court orders and evade arrest." Pesin, 244 F.3d at 1253.
¶ 12. The facts of Pesin are very similar to the facts of the instant case. There, a mother refused to comply with a federal court order requiring her to return her children to their father in Venezuela, failed to attend a status conference, and failed to appear at a show cause hearing. Following the mother's failure to attend the show cause hearing, "the district court found [the mother] in contempt for her multiple refusals to comply with the court's orders and entered a bench warrant for her arrest." Id. at 1252. In dismissing the mother's appeal, the circuit court stated the following:
Osorio has repeatedly defied court orders and ignored contempt sanctions and has continued to evade arrest. Her behavior to date leaves little doubt that she would defy an adverse ruling. Moreover, it would be inequitable to allow Osorio to use the resources of the courts only if the outcome is a benefit to her. We cannot permit Osorio to reap the benefits of a judicial system the orders of which she has continued to flaunt. Accordingly, Osorio's appeal is dismissed.
Id. at 1253. Other courts faced with similar circumstances have likewise applied the fugitive dismissal rule. See, e.g., Searle v. Juvenile Court for Williamson County, 188 S.W.3d 547 (Tenn.2006); Peppin v. Lewis, 194 Misc.2d 151, 752 N.Y.S.2d 807 (N.Y.Fam.Ct.2002).
¶ 13. Mindful of the United States Supreme Court's admonition that the fugitive dismissal rule is a "blunt" instrument to be given serious consideration, we find that the interests furthered by the Mississippi Supreme Court's application of the fugitive dismissal rule in Hires will be equally served by our dismissal of Weaver's appeal in the case sub judice. Conduct which jeopardizes the health, safety, and welfare of a child is certainly worthy of deterrence, and this Court is entitled to the same dignity and efficiency in the context of a criminal contempt appeal as is demanded in the context of a criminal appeal. Furthermore, we find the reasoning employed by other jurisdictions faced with circumstances similar to those before this Court to be particularly relevant. Weaver has unmistakably ignored the orders of the chancellor in the proceedings below and even acknowledged this fact in his response to one of Parks's contempt petitions. Weaver remains at large with Chloe, their whereabouts and Chloe's health status unknown. Weaver's conduct to date leaves little doubt that he would not abide by an adverse ruling. Allowing Weaver to employ this Court's resources only if the outcome is favorable to him would be an affront to the dignity of this Court and would only encourage such behavior in the future. Simply stated, "[w]e cannot permit [Weaver] to reap the benefits *1015 of a judicial system the orders of which [he] has continued to flaunt." Pesin, 244 F.3d at 1253.
¶ 14. Accordingly, we dismiss Weaver's appeal sua sponte. However, as one of our primary concerns in employing the fugitive dismissal rule in the instant case is the safe return of Chloe, should Weaver return Chloe to the temporary custody of Parks and submit to the jurisdiction of the Chancery Court of Hinds County, as well as to the jurisdiction of this Court, within thirty days of this order, Weaver's appeal will be reinstated. See Derrick v. State, 406 So.2d 48 (Miss.1981) (stating that fugitive "dismissal shall be subject to be reinstated on motion of appellant showing good cause therefor"); see also United States v. Awadalla, 357 F.3d 243, 247-50 (2d Cir.2004) (discussing the court's "discretion to dismiss [the fugitive's] appeal with or without prejudice").[7]
¶ 15. THIS APPEAL IS DISMISSED SUA SPONTE. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] Throughout the record, Madison Chloe Weaver is also referred to as Madison Chloe Cook. While the record does not make clear which is Chloe's legal name, we note that these two names refer to the same minor child. We will use the former name when referring to the minor child; however, the latter name may appear by way of excerpts from the record.
[2] The record does not reflect that any of the parties genuinely disputed that Weaver was Chloe's father; however, this fact was not legally established until after initiation of the instant action.
[3] According to the record, Weaver moved in with his mother, Cathy Weaver Terrell, after the death of Chastity. The agreed order provided that visitation would take place in the home of Weaver's mother.
[4] Contrary to Weaver's argument on appeal, this habeas corpus order did not grant temporary custody of Chloe to Parks, it simply acknowledged what had been established by the June 14, 2004 "Agreed Order." Furthermore, the order has never been carried out as the whereabouts of Chloe and Weaver remain unknown.
[5] At the beginning of the constructive criminal contempt and show cause hearing, counsel for Weaver made a motion that the chancellor recuse himself from the case, and this motion was denied. During a subsequent colloquy between the chancellor and Weaver's counsel, the chancellor reiterated that he would not recuse himself from presiding over the hearing. In the court's "Judgment Finding Defendant/Respondent in Constructive Criminal Contempt of Court," the chancellor stated that Weaver's fears regarding the court's attitude toward a racially mixed child were "unfounded and irrational." The chancellor further noted that, prior to the contempt hearing, "the Court volunteered to step aside in the event the child was returned safely to the Court forthwith, and obtained consent of one of the African-American Chancellors in Hinds County to hear all remaining proceedings, an offer which was declined."
[6] The whereabouts of Weaver and Chloe are still unknown, and since the night of September 22, 2004, the only individuals to have admittedly seen Weaver and Chloe are Weaver's father, Cordell Weaver, and his mother, Cathy Weaver Terrell. Both Cordell and Terrell admitted seeing Weaver and Chloe at some point shortly after Christmas, 2004.
[7] In Awadalla, the court devoted considerable discussion to this issue. While the court ultimately dismissed the fugitive appellant's appeal with prejudice, the court nevertheless acknowledged cases from both the United States Court of Appeals for the Second Circuit and from the United States Supreme Court where fugitives were given "a short grace period in which to return to custody before their appeals would finally be removed from the docket." Awadalla, 357 F.3d at 248 (citing United States v. Sotomayor, 592 F.2d 1219, 1220 n. 1 (2d Cir.1979) (30 day grace period); United States v. Sperling, 506 F.2d 1323, 1345, n. 33 (2d Cir.1974) (30 day grace period); Stern v. United States, 249 F.2d 720, 722 (2d Cir.1957) (60 day grace period)).